## JACKSONVILLE, MAYPORT, PABLO RAILWAY AND NAVIGATION COMPANY *v.* HOOPER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF FLORIDA.

No. 80. Submitted November 21, 1895. — Decided January 13, 1896.

Whether an instrument is under seal or not is a question for the court upon inspection; but whether a mark or character shall be held to be a seal, depends upon the intention of the executant, as shown by the paper.

When no legislative prohibition is shown, it is within the chartered powers

of a railroad company to lease and maintain a summer hotel at its sea-side terminus, and such power is conferred on railroads in Florida.

The authority of the president of such company to execute in the name of the company a lease to acquire such hotel may be inferred from the facts of his signing, sealing, and delivering the instrument, and of the company's entering into possession under the lease and exercising acts of ownership and control over the demised premises, even if the minutes of the company fail to disclose such authority expressly given.

The court adheres to the rule laid down in *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, that a contract of a corporation which is *ultra vires* in the proper sense is not voidable only, but wholly void and of no legal effect; but it further holds that a corporation may also enter into and engage in transactions which are incidental or auxiliary to its main business, which may become necessary, expedient, or profit-able in the care and management of the property which it is authorized to hold, under the act by which it is created.

Impossibility of performing a contract, arising after the making of it, al-though without any fault on the part of the covenantor, does not dis-charge him from his liability under it.

A lessee of a building who contracts in his lease to keep the leased build-ing insured for the benefit of the lessor during the term at an agreed sum, and fails to do so, is liable to the lessor for that amount, if the building is destroyed by fire during the term.

There is no error in an instruction to the jury, where the evidence is con-flicting, that in coming to a conclusion they should consider the testi-mony in the light of their own experience and knowledge.

In the Circuit Court of the United States for the Northern District of Florida, on the 4th day of December, 1889, Mary J. Hooper, Henry H. Hooper, her husband, and William F. Porter, for the use of said Mary J. Hooper, citizens of the State of Ohio, brought an action against the Jacksonville, Mayport, Pablo Railway and Navigation Company, a corpora-tion of the State of Florida. The plaintiffs' amended decla-ration set up causes of action arising out of the covenants contained in a certain indenture of lease between the parties. This lease, dated July 10, 1888, purported to grant, for a term of two years, certain lots of land situated at a place called "Burnside," in Duval County, Florida, whereon was erected a hotel known as the "San Diego Hotel." In consideration of this grant the railroad company agreed to pay in monthly instalments a yearly rent of $800, and to keep the premises insured in the sum of $6000.

It was alleged that on November 28, 1889, during said term, and while the railway company was in possession, the hotel and other buildings were wholly destroyed by fire ; that the defendant had failed and neglected to have the same insured, and that there was an arrearage of rent due amounting to the sum of $106.67. For the amount of the loss occasioned by the absence of insurance and for the back rent the action was brought.

The defendant denied that the railway company had duly executed the instrument sued on ; denied that Alexander Wallace, the president of the company, and who had executed the lease as such president, had any authority from the company so to do. The defendant also alleged that such a lease, even if formally executed, was *ultra vires;* also that the covenant to insure was an impossible covenant, as shown by ineffectual efforts to secure such insurance.

The case was tried in April, 1891, and resulted in a verdict and judgment against the defendants in the sum of $6798.70. On errors assigned to certain rulings of the court and in the charge to the jury the case was brought to this court.

*Mr. J. C. Cooper* for plaintiff in error.

*Mr. James R. Challen* for defendants in error.

Mr. Justice Shiras, after stating the case, delivered the opinion of the Court.

The nineteen assignments of error may be classified as follows : Those which raise questions as to the sufficiency of the proof of the due execution by the defendant of the contract sued on; those which deny the competency of the railroad company to enter into such a contract; those which deal with the question whether the defendant was relieved from liability on its covenant to insure by reason of alleged impossibility to comply therewith; finally, those alleging error in the admission of evidence, and in certain portions of the charge — particularly in respect to the measure of damages.

We shall discuss these alleged errors in the order thus mentioned.

The declaration was in covenant, and contained, as an attached exhibit, what was alleged to be a certified copy of the contract sued on, the final clause whereof was as follows:

"In witness whereof the parties hereto have hereunto set their hands and seals this the day and year above written.

  "JACKSONVILLE, MAYPORT, PABLO RAILWAY
    AND NAVIGATION COMPANY,  [Seal.]
   "By ALEX. WALLACE, *President.*
  "WM. F. PORTER,      [Seal.]
   "By H. H. HOOPER, JR., *Att'y in fact.*
  "H. H. HOOPER.      [Seal.]
  "MARY J. HOOPER.     [Seal.]"

The attesting clause was as follows:

"Signed, sealed, and delivered in the presence of us.
  "H. H. BURKMAN,
  "H. H. BOWNE,
    *As to R. R. Co., H. H. Cooper,*
       *and W. F. Porter.*
  "JOHN MULHOLLAND,
  "SAM'L E. DUFFY,
    *As to Mary J. Hooper.*"

The defendant demurred on several grounds, one of which was as follows:

"That attached to the said declaration is a paper purporting to be the contract which is the basis of this suit, which paper is alleged to be a lease between the defendant company and the plaintiffs, and which paper is referred to in each and every count of said declaration, and asked and prayed and made a part of said declaration; that each and every count of same declares in covenant, and yet the same contains on the face thereof and the face of the paper made part thereof that the said cause of action will not lie because the said paper is

not under seal; that there is no seal of the defendant company to said paper."

The theory of this demurrer appears to be that there should have been an averment on the face of the instrument that the seal attached, on behalf the company, was its common or corporate seal. However, there was an averment that the parties had set their hands and seals to the paper, and the attesting clause alleged that the railroad company had signed, sealed, and delivered in the presence of two witnesses, who signed their names thereto. On demurrer this was plainly sufficient.

But it is urged in the third and fourth assignments that it was error to permit to be put in evidence the certified copy of the lease, as likewise the duplicate lease, because they were not shown to be under the seal of the company, but appeared to be under the private seal of Alexander Wallace, the president of the company. But, in the absence of evidence to the contrary, the scroll or rectangle containing the word "seal" will be deemed to be the proper and common seal of the company. A seal is not necessarily of any particular form or figure.

In *Pillow* v. *Roberts*, 13 How. 472, 474, this court said, through Mr. Justice Grier, when discussing an objection that an instrument read was improperly admitted in evidence because the seal of the Circuit Court authenticating the acknowledgment was an impression stamped on paper and not "on wax, wafer, or any other adhesive or tenacious substance," said: "It is the seal which authenticates, and not the substance on which it is impressed; and where the court can recognize its identity, they should not be called upon to analyze the material which exhibits it. In Arkansas the presence of wax is not necessary to give validity to a seal; and the fact that the public officer in Wisconsin had not thought proper to use it, was sufficient to raise the presumption that such was the law or custom in Wisconsin, till the contrary was proved. It is time that such objections to the validity of seals should cease. The court did not err in overruling the objections to the deed offered by the plaintiff." *Price* v. *Indseth*, 106 U. S. 546, is to the same effect.

Whether an instrument is under seal or not is a question for the court upon inspection; whether a mark or character shall be held to be a seal depends upon the intention of the executant, as shown by the paper. *Hacker's Appeal*, 121 Penn. St. 192; *Pillow* v. *Roberts, ub. supra.*

The defendant did not produce the original in order that it might be compared in the particular objected to with the copy and duplicate offered. The defendant's attorney, Mr. Buckman, was called, and testified that he was one of the attesting witnesses to the instrument offered, and that he, as a notary public, took the acknowledgment thereto of Alexander Wallace, that he executed the same for and in behalf of the company, and that the said lease was the act and deed of the defendant company for the uses and purposes therein expressed.

Whether, therefore, the instrument put in evidence was merely a copy, in which event it would not be expected that a wax or stamped seal of the company would appear upon it, but merely a scroll, representing the original seal, or whether the so-called copy was really the original paper, as certified by one of defendant's witnesses, would not, in our opinion, be material. The presumption would be, if the paper were a copy, that the original was duly sealed, or, if it were the original, that the scroll was adopted and used by the company as its seal, for the purpose of executing the contract in question.

As respects those portions of the objections that raised the question as to the authority of the president to execute the contract in question, there was, besides the presumption that would arise out of the signing, sealing, and delivering of the instrument, evidence that the company exercised acts of ownership and control over the demised premises, took charge of them by their superintendent, took an inventory of the property, rented the hotel portion to a third party, received money rent therefor, gave a receipt therefor under the seal of the company, opened a hotel account on their cash book, which showed receipts of rent from the tenant, and expenditures for moving the hotel and for making improvements therein, and

there was evidence adduced by the defendant itself of efforts to get the property insured in pursuance of their contract.

An exception was taken by the defendant to the action of the court in permitting Mrs. Roberts, the company's tenant, to testify to statements made to her by Alexander Wallace, the president of the company, the ground of objection being that Wallace was dead at the time of the trial. Statements made by the president, if relevant to the controversy, would be competent to affect the company, even if he were dead at the time of the trial. In the present case, it was relevant to show that the witness, when about to rent the hotel, was told by the president to go to Mr. Warriner, the secretary of the company, to whom she paid one month's rent, and who gave her a receipt therefor, with the corporate seal attached. The witness was not a party to nor interested in the suit, nor was the president or his executor or administrator. The admissions made by the president, subsequently, in a casual conversation, as to his ineffectual efforts to get the hotel insured, could scarcely be regarded as relevant and competent to affect the company. But the error, if such it were, in permitting such statements to be received, was rendered immaterial by the action of the company, in adducing affirmative evidence, in its own behalf, to the very same effect, namely, the efforts made by the company and its officers to procure insurance.

Complaint is made of the action of the court in rejecting the offer of the defendant's by-laws for the purpose of showing want of authority to make the lease sued on without the consent of the stockholders or board of directors, and the accompanying offer of the minutes, which did not disclose that any such authority had been granted.

In considering what weight should be given to the error assigned to the rejection of the by-laws, we have a right to advert to the copy of them contained in the bill of exceptions. There we learn that the powers conferred upon the president were in the following terms:

" The president shall preside at all meetings of the board of directors and of the company (of which he shall be president), and shall have the general management and supervision of the

operation of the lines of road of said company and the general business thereof; subject, however, at all times to the control of the board of directors. He shall, when so directed and empowered by the board of directors, execute and sign for and on behalf of said company all documents and writings authorized to be made and executed for and on its behalf. He shall draw and issue all warrants for the payment of moneys on the treasurer of said company when so ordered by the board, and sign the same. He shall make an annual report to said company of the condition thereof, with such suggestions and recommendations as he may deem proper, and to said board of directors whenever required by them; and shall do and perform such other duties as are consistent with said office, and others of a like nature pertaining thereto."

This by-law appears to describe the powers and duties usually possessed by presidents of railroad companies, and we are, therefore, relieved from considering what would have been the effect of an unusual restriction on the powers of such an officer, and whether those dealing with a railroad company would be obliged to take notice of such unusual restriction.

The question, therefore, we have to consider is whether the admission in evidence of the by-law would have affected the result reached by the court and jury in the case.

Assuming, for the present purposes of the discussion, that the subject-matter of the contract in question was within the legitimate scope of the company's powers, we think the facts and circumstances shown by the evidence disclose a case in which the company would be bound, notwithstanding there was no proof that the president was expressly authorized to make the contract by a previous resolution of the board. The evidence was undisputed that, after the execution of the lease, the company took possession of the demised premises, rented to a third party the hotel portion thereof, and received and receipted for rent of the hotel.

The case, in this particular, resembles and falls within the principle of *Eureka Co.* v. *Bailey Co.*, 11 Wall. 488, 491, where the binding force of a contract was denied for alleged want of

authority of an agent to make the same, and this court, through Mr. Justice Miller, held:

" We are satisfied that the agreements set up in the bill are the valid contracts of the defendant.  Though the plaintiff was unable to produce any resolution or order in writing by the trustees or board of directors of the defendant corporation, and though the seal used was the private seal of one of its officers, instead of the corporate seal, neither of these is essential to the validity of the contract.  We entertain no doubt. that Rindge, the agent and one of the directors and treasurer of the Eureka company, was authorized to execute the agreement, and, if any doubt existed on that point, the report and payment for five hundred machines, the first month's use of the patent under the agreement, would remove the doubt.  If it did not, it would very clearly amount to a ratification."

In *Bank of the United States* v. *Dandridge*, 12 Wheat. 64, 83, it was held that where a cashier was appointed, and permitted to act in his office, for a long time, under the sanction of the directors, it was not necessary that his official bond should be accepted as satisfactory by the directors, according to the terms of the charter, in order to enable him to enter legally on the duties of his office, or to make his sureties responsible for the nonperformance of their duties ; that the charter and the by-laws are to be considered, in this respect, as *directory* to the board, and not as *conditions precedent;* and Mr. Justice Story, in discussing the subject, said: "A board may accept a contract, or approve a security, by a vote, or by a tacit and implied assent.  The vote or assent may be more difficult of proof by parol evidence than if reduced in writing.  But this is, surely, not a sufficient reason for declaring that the vote or assent is inoperative."  See also *Pittsburgh & Cincinnati Railway* v *.Keokuk & Hamilton Bridge Co.,* 131 U. S. 371, 138.

As, then, the contract in question was, upon our present assumption, within the legitimate scope of the powers of the company, was executed by that officer of the company who by the by-laws was the proper agent to perform such function, and as the company went into possession of and received the rents and profits of the hotel, we conclude that the com-

pany was bound thereby, even if the minutes of the company fail to disclose authority expressly given to the president to execute the contract.

It is, however, further claimed that the contract sued on was not within the legitimate powers of the company.

This is not a case in which, either by its charter, or by some statute binding upon it, the company is forbidden to make such a contract. Indeed, the public laws of Florida, referring to the powers of railroad companies, provide that every such corporation shall be empowered "to purchase, hold, and use all such real estate and other property as may be necessary for the construction and maintenance of its road and canal and the stations and other accommodations necessary to accomplish the objects of its incorporation, and to sell, lease, or buy any land or real estate not necessary for its use." McClell. Digest of the Laws of Florida, p. 276, sec. 10. They are likewise authorized "to erect and maintain all convenient buildings, wharves, docks, stations, fixtures, and machinery for the accommodation and use of their passengers and freight business."

Although the contract power of railroad companies is to be deemed restricted to the general purposes for which they are designed, yet there are many transactions which are incidental or auxiliary to its main business, or which may become useful in the care and management of the property which it is authorized to hold, and in the safety and comfort of the passengers whom it is its duty to transport.

Courts may be permitted, where there is no legislative prohibition shown, to put a favorable construction upon such exercise of power by a railroad company as is suitable to promote the success of the company, within its chartered powers, and to contribute to the comfort of those who travel thereon. To lease and maintain a summer hotel at the seaside terminus of a railroad might obviously increase the business of the company and the comfort of its passengers, and be within the provisions of the statute of Florida above cited, whereby a railroad company is authorized "to sell, lease, or buy any land or real estate not necessary for its use," and to "erect and maintain all

convenient buildings . . . for the accommodation and use of their passengers."

Courts may well be astute in dealing with efforts of corporations to usurp powers not granted them, or to stretch their lawful franchises against the interests of the public. Nor would we be understood to hold that, in a clear case of the exercise of a power forbidden by its charter, or contrary to public policy, a railroad company would be estopped to decline to be bound by its own act, even when fulfilled by the other contracting party. *Davis* v. *Old Colony Railroad Co.,* 131 Mass. 258; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24. So, too, it must be regarded as well settled, on the soundest principles of public policy, that a contract, by which a railroad company seeks to render itself incapable of performing its duties to the public, or attempts to absolve itself from its obligation without the consent of the State, is void and cannot be rendered enforceable by the doctrines of estoppel. *The New York & Maryland Railroad Co.* v. *Winans,* 17 How. 30; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24.

We do not seek to relax but rather to affirm the rule laid down by this court, in *Central Transportation Co.* v. *Pullman's Car Company,* (above cited,) that " a contract of a corporation, which is *ultra vires,* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and, therefore, beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect — the objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. Such a contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." 139 U. S. 59, 60.

But we think the present case falls within the language of Lord Chancellor Selborne, in *Attorney General* v. *Great Eastern Railway,* 5 App. Cas. 473, 478, where, while declaring

his sense of the importance of the doctrine of *ultra vires*, he said: "This doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may fairly be regarded as incidental to, or consequential upon, those things which the legislature has authorized, ought not, unless expressly prohibited, to be held, by judicial construction, to be *ultra vires*." In the application of the doctrine the court must be influenced somewhat by the special circumstances of the case. As was said by Romilly, M. R., in *Lyde v. Eastern Bengal Railway*, 36 Beav. 10, where was in question the validity of a contract by a railway company to work a coal mine: "The answer to this argument appears to me to depend upon the facts of each particular case. If, in truth, the real object of the colliery was to supply the railway with cheaper coals, it would be proper to allow the accidental additional profit of selling coal to others; but if the principal object of the colliery was to undertake the business of raising and selling coals, then it would be a perversion of the funds of the company, and a scheme which ought not to be permitted, however profitable it might appear to be. The prohibition or permission to carry on this trade would depend on the conclusions which the court drew from the evidence."

The principle upon which we may safely rule the present question is within the case of *Brown v. Winnisimmet Company*, 11 Allen, 326, 334. There a contract, made by the treasurer of a ferry company, to lease one of the company's boats for a certain money consideration, was alleged to be void for want of antecedent authority given by the company to the treasurer, and also because such a contract was not made in the legitimate exercise of the company's powers. On the first point it was ruled that, from evidence showing ratification by the company, it was proper for the jury to infer that the treasurer had been duly authorized to make the contract, and, disposing of the second question, the court, through Chief Justice Bigelow, said: "We know of no rule or principle by which an act, creating a corporation for certain specific objects, or to carry on a particular trade or business, is to be strictly construed as prohibitory of all other dealings or trans-

actions not coming within the exact scope of those designated. Undoubtedly the main business of a corporation is to be confined to that class of operations which properly appertain to the general purposes for which its charter was granted. But it may also enter into and engage in transactions which are incidental or auxiliary to its main business, which may become necessary, expedient, or profitable in the care and management of the property which it is authorized to hold under the act by which it was created." See also *Davis* v. *Old Colony Railroad*, 131 Mass. 258, 272.

The contract between the parties hereto was for leasing a hotel at the terminus of the railroad, situated at a beach, distant from any town. If not fairly within the authority granted by the statute of Florida " to erect and maintain all convenient buildings . . . for the accommodation and use of their passengers," it certainly cannot be said to have been forbidden by such laws. Nor can it be said to have been, in its nature, contrary to public policy.

To maintain cheap hotels or eating houses, at stated points on a long line of railroad through a wilderness, as in the case of the Pacific railroads, or at the end of a railroad on a barren, unsettled beach, as in the present case, not for the purpose of making money out of such business, but to furnish reasonable and necessary accommodations to its passengers and employés, would not be so plainly an act outside of the powers of a railroad company as to compel a court to sustain the defence of *ultra vires*, as against the other party to such a contract.

But even if the railroad company might be answerable for the rent of the premises, it is contended that the covenant to procure insurance was so far outside of the company's powers as not to be enforceable.

No one could deny that it would not be competent for a railroad company, without the authority of the legislature, to carry on an insurance business. But this covenant to keep the premises insured is correlative to the obligation of the lessors to rebuild in case the hotel should be destroyed by fire, and to the provision that, in such an event, the rents should cease until the hotel should be put in habitable condition and repair

by the lessors. Such mutual covenants are quite usual in leases of this kind, and are merely incidental to the principal purpose of the contract.

Suppose the contract proven and the defence of *ultra vires* deemed inadmissible, it is claimed by the railroad company that it is not liable in damages for its failure to procure the insurance, because it was unable to get the insurance; that its contract, in that particular, was impossible of performance.

There is such a defence known to the law as an impossibility of performance. Instances of such a defence are found in cases where the subject-matter of the contract had ceased to exist, as where there was a contract of sale of a cargo of grain supposed by the parties to be on its voyage to England, but which, having become heated on the voyage, had been unloaded and sold, and where it was held that the contract was void, inasmuch " as it plainly imputed that there was something which was to be sold and purchased at the time of the contract," whereas the object of the sale had ceased to exist. *Courtrier* v. *Hastle*, 5 H. L. Cas. 673; *Allen* v. *Hammond*, 11 Pet. 63.

So, also, where a person purchased an annuity which, at the time of the purchase, had ceased to exist owing to the death of the annuitant, it was held that he could recover the price which he had paid for it. *Strickland* v. *Turner*, 7 Exch. 208.

So where there is obvious physical impossibility, or legal impossibility, which is apparent on the face of the contract, the latter is void.

But the present case does not fall within either of these classes, but is a case of impossibility of performance arising subsequently to the making of the contract.

Here, the general rule is that such impossibility, even though it arises without any fault on the part of the covenantor, does not discharge him from his liability under the contract. " The principle deducible from the authorities is that if what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. Nothing short of this

will excuse performance. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is in the province of courts to enforce contracts — not to make or modify them. When there is neither fraud, accident, nor mistake, the exercise of dispensing power is not a judicial function." *The Harriman,* 9 Wall. 161, 172. Impossible conditions cannot be performed; and if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an impossibility. But where the contract is to do a thing which is possible in itself, the performance is not excused by the occurrence of an inevitable accident, or other contingency, although it was not foreseen by the party, nor. within his control." *Jones* v. *United States,* 96 U. S. 24, 29.

It appears that there was some evidence to the effect that, prior to the making of the lease, the owners of the hotel had some conversation with one or more insurance agents, who refused to insure the hotel building, and upon this evidence the defendant asked the court to charge the jury that if the plaintiffs knew that the property, at the time of the making of the contract, was not insurable, or, if knowing that they had tried to get insurance and failed, they did not so notify the defendant, then the plaintiffs acted in bad faith, and should not be permitted to recover. The court refused to so charge and very properly. The evidence disclosed by the record, even if believed by the jury, would not have justified a verdict that the plaintiffs acted in bad faith. It is not shown that they made any false representations on the subject, and the very fact that they demanded a covenant to procure insurance from the defendant put the latter on inquiry as to its ability to procure it.

Error is alleged in the refusal of the court to charge that "if the jury believed from the evidence that insurance on the property in question was sought to be obtained at the usual places where such insurance would be applied for, and such agencies applied to, representing companies insuring property in all parts of the United States, refused to insure the property, on the ground that such property was not insurable, and in-

surance companies would not insure such classes of property, then the agreement to insure was impossible of performance, and plaintiffs could not recover."

We are not furnished in this record, by any bill of exceptions or by a certificate of the judge, with all the evidence on which this request to charge was based, but assuming that the evidence contained in the bill of exceptions was all that there was, it would have been error in the court to have given the instruction prayed for. That evidence is very far from disclosing the state of facts assumed in the request. Two or three insurance agents, resident in the city of Jacksonville, testified that on one or two occasions, whose dates they could not fix, there had been inquiries made by some one representing the defendant about insurance. Giving the utmost effect to the testimony, it altogether failed to show such a case of impossibility as would, under the authorities, have discharged the defendant from the obligation of its contract; and we think the court would not have erred in so charging the jury. However, the court left the question as one of fact to the jury, and we perceive no misdirection in his remarks.

It remains to consider the question of the measure of damages and some objections made to the charge of the court on that subject.

If the defendant subjected itself, by a valid contract, to keep the premises insured in the sum of six thousand dollars during the term of the lease, and, without sufficient cause, failed to do so, and if the hotel was worth the sum mentioned, and was wholly destroyed by fire, the extent of the defendant's liability would obviously be the amount of the plaintiffs' damages, namely, six thousand dollars.

It is argued that the defendant received no consideration for agreeing to insure the property; that it contracted to pay the costs of insurance as part of the rental, and the cost of the premium of insurance was the proper measure of recovery. The obligation of the lessors to rebuild and repair in case of fire, and the suspension of the rent so long as the premises remained uninhabitable, formed the consideration of the defendant's agreement to insure; and we cannot accept the

proposition that the plaintiffs' damages arising out of the breach of the contract are to be measured by what it would have cost the defendant to secure the stipulated insurance.

Complaint is made of the observations made by the judge when instructing the jury as to the weight which they should give to the testimony in relation to the value of the property. The testimony was somewhat conflicting, and the remark chiefly criticised was to the effect that, in coming to a conclusion, the jury should consider the testimony in the light of their own experience and knowledge. We do not regard such a caution as objectionable.

In deciding disputes between litigant parties, where witnesses are naturally apt to state facts strongly in favor of their respective principals, the jury well may, and, in fact, must, use their own knowledge and experience in the ordinary affairs of life to enable them to see where is the truth. This is particularly true where, as in the present case, the conflict was in matter of opinion as to the value of a building no longer in existence.

The plaintiffs conceded that all the rent had been paid except $106.67, which in the declaration was demanded. The defendant gave no evidence on the subject, and in such a state of the record and of the evidence we think no error was committed by the court in charging the jury that they could find for the plaintiffs the amount of rent demanded unless the defendant showed that it had been paid.

These views cover all the assignments of error which we deem worthy of notice, and the judgment of the court below is

*Affirmed.*