RICHMOND GUANO CO. v. FARMERS' COTTON SEED OIL MILL & GINNERY et al.

(Circuit Court, D. South Carolina. December 27, 1902.)

1. CORPORATIONS—LIMITATION OF POWERS BY PURPOSES OF INCORPORATION—CONTRACTS ULTRA VIRES.

A corporation organized "to build and operate a cotton seed oil mill and ginnery in connection therewith, to compress cotton seed oil, to buy cotton seed, to sell their products, to manipulate and compound cotton seed meal with other substances and elements so as to make fertilizers to be sold for fertilizing lands, and to gin and compress cotton into bales for the market," has no power to engage in the business of selling a fertilizer manufactured by another, which must be sold in the condition in which it is received, making as a profit what it can obtain above the invoice price; and notes given by the corporation for such invoice price are ultra vires and void.

2. SAME—DISTRIBUTION OF ASSETS IN INSOLVENCY—AGREEMENT FOR ATTORNEY
    FEES IN NOTES.
    In South Carolina, where an agreement in a note to pay a stipulated
    per cent. as attorney's fees in case of suit thereon is valid, where a court
    of equity in a creditors' suit to wind up an insolvent corporation enjoins
    actions at law to collect claims, and requires all creditors to prove their
    claims therein, holders of notes containing such agreements, who employ
    attorneys, are entitled to the stipulated per cent. on the dividends received
    as attorney's fees from the fund distributed.

In Equity. Creditors' suit for winding up the affairs of an insolvent corporation.

Heyward, Dean & Earle, for complainant.
Haynsworth, Parker & Patterson, for defendants.
B. M. Shuman, for certain creditors.

BRAWLEY, District Judge. This case now comes up after the report of the special master with the testimony. Three matters are presented for consideration: (1) Whether the claim of the Richmond Guano Company can be allowed; (2) whether the 10 per cent. for attorney's fees provided for in certain notes of the defendant company can be charged against the fund; (3) whether the City National Bank can be charged with any part of such fee as may be allowed the solicitor of complainant for filing the bill.

As to the claim of the Richmond Guano Company. It is alleged that the transaction between this company and the Farmers' Cotton Seed Oil & Ginnery Company was one not within the scope of the charter of the last-named corporation, and so, being ultra vires, is void. This contention is made by the City National Bank, a creditor of that corporation, and must be considered. 5 Thomp. Corp. § 6034. When the motion was made for the appointment of a permanent receiver, the same question was made by the City National Bank. It was not passed upon, because at that time it was not necessary. The bill was a creditors' bill. So the question was reserved until proof of claims could be made and all parties were before the court. The Farmers' Cotton Seed Oil Mill & Ginnery Company was chartered under the general law of South Carolina on May 14, 1900. "The general purpose of the corporation and the nature of the business it proposes to do is to build and establish a cotton seed oil mill and ginnery in connection therewith, and to compress cotton seed oil, to buy cotton seed, to sell their products, manipulate and compound cotton seed meal with other substances and elements so as to make fertilizers to be sold for fertilizing lands, to gin and compress cotton into bales for the market." Under this charter, with these declared objects, the corporation began business. The outlines of the doctrine of ultra vires, and the reasons upon which it rests, have been fully discussed and clearly stated in many of the decisions of the supreme court. In Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 2 Sup. Ct. 221, 27 L. Ed. 413, it is thus expressed:

"The charter of a corporation, read in connection with the general laws applicable thereto, is the measure of its powers, and a contract manifestly beyond these powers will not sustain an action against the corporation. But

whatever under the charter and other general laws, reasonably construed, may be fully regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

This rule and the language used in it has been repeatedly recognized and affirmed. Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339, 38 L. Ed. 167; Pittsburgh, C. & St. L. Ry. Co. v. Keokuk & H. Bridge Co., 131 U. S. 385, 9 Sup. Ct. 770, 33 L. Ed. 157; Navigation Co. v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515. Lord Chancellor Selborne, in Attorney General v. Great Eastern Ry. Co., 5 App. Cas. 473, uses this language:

"This doctrine [ultra vires] ought to be reasonably, and not unreasonably, understood and applied, and that whatever may be fairly regarded as incidental to or consequential upon those things which the legislature has authorized ought not, unless expressly prohibited, to be held by judicial construction to be ultra vires."

This statement of the doctrine is adopted and approved in Railroad Co. v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515. Bigelow, C. J., in Brown v. Winnissimmet Co., 11 Allen, 326, says:

"We know of no rule or principle by which an act creating a corporation for certain specific objects or to carry on a particular trade or business is to be strictly construed as prohibitory of all other dealings or transactions not coming within the exact scope of those designated. Undoubtedly, the main business of a corporation is to be confined to that class of operations which properly appertain to the general purposes for which its charter was granted. But it may also enter into contracts and engage in transactions which are incidental or auxiliary to its main business, or which may become necessary, expedient, or profitable in the care and management of the property which it is authorized to hold under the act by which it is created."

There can be no doubt that a contract of a corporation ultra vires is absolutely void, and of no legal effect, incapable of ratification by either party. Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 59, 60, 11 Sup. Ct. 478, 35 L. Ed. 55.

The Richmond Guano Company and the Farmers' Oil & Ginnery Company made two contracts identical in character; one on March 4, 1901, the other December 22, 1902. The contracts are in form offers to the Cotton Seed Oil Company to furnish it this season, delivered in car lots, f. o. b. at Greenville, certain fertilizers at certain cash and credit prices, to be sold by the Cotton Seed Oil Company as agent for Richmond Guano Company. All cash sales to be accounted for on or before May 1, 1901. Notes for the remainder to be given by the Cotton Seed Oil Company, payable one-third November 1, 1901, one-third November 15, 1901, and one-third December 1, 1901. The Cotton Seed Oil Company agrees further that all fertilizers ordered by it and all proceeds therefrom are the property of Richmond Guano Company, held in trust by the Cotton Seed Oil Company for its account until these notes are paid in full. It also agrees to take bonds or notes for all sales made by it on credit, and to turn all these over to the Richmond Guano Company as collateral security for said notes. Provision is also made for shipping goods to sundry other points than Greenville at slightly increased rates. Under these contracts 1,500 tons of fertilizers were shipped in sacks, each sack having on it a guaranty of the analysis. And pursuant to the agreement these notes were executed by the

Farmers' Cotton Seed Oil & Ginnery Company to the Richmond Guano Company, each dated May 18, 1901, each bearing interest after maturity at rate of 6 per cent. per annum, each agreeing to pay 10 per cent. attorney's commissions if collected by an attorney by suit or otherwise,—one due November 1, 1901, for $6,200; another due November 15, 1901, for $6,191.30; the third due December 1, 1901, for $1,200. The notes given for the sale of these fertilizers were all assigned to and are in the possession of the Richmond Guano Company as collateral for three notes. An exhibit is with the report, showing that on these collaterals and from other sources there has been paid on the three notes $14,399.14, leaving a balance of $4,192.16 of principal and $290.74 of interest,—in all, $4,482.90,—unpaid. There is no report as to the correctness of this in the record. It is impossible to call these contracts sales of goods. They expressly stipulate that all the fertilizers ordered and the proceeds thereof are the property of the Richmond Guano Company, to be held in trust by the Cotton Seed Oil Company for the account of Richmond Guano Company. The contracts are really an agreement by the Farmers' Cotton Seed Oil & Ginnery Company to receive fertilizers from the Richmond Guano Company, sell them for its account, binding itself for the invoice price of the shipments, and looking for its compensation to the sums over and above the invoice prices which it could obtain. Is this character of business within the scope of, or incidental to, the business authorized by the charter? The charter authorizes it to build and establish a cotton seed oil mill and ginnery in connection therewith, to compress cotton seed oil, to buy cotton seed, to sell their products, to manipulate and compound cotton seed meal with other substances and elements so as to make fertilizers to be sold for fertilizing lands, and to gin and compress cotton in bales for the market." These contracts provide for the sale by this corporation, for a hoped-for profit, of fertilizers manufactured by the Richmond Guano Company, for the account of this last-named company; the same to be shipped in bags, having on them a guarantied analysis, which would be of no value if the bags were opened and other ingredients put in. It is said in the evidence and in argument that farmers mixed cotton seed meal with fertilizers, and that the sale of these fertilizers helped to sell the cotton seed meal. But in the same way the sale of any other desirable article might help the sale of meal, but this would not authorize the company to keep a general store. In Davis v. Railroad Co., 131 Mass. 258, 41 Am. Rep. 221, it was held that a corporation organized under a general act, the purpose of whose organization was the manufacture and sale of reed organs and other musical instruments, could not, in addition to the power to manufacture and sell goods of a particular description, partake in a guaranty of the profits of an enterprise that may be expected to increase the use or demand for such goods. "An incidental power," says the supreme court of Connecticut in Hood v. Railroad Co., 22 Conn. 1, "is one that is directly and immediately appropriate to the execution of the power granted, and not one that has a slight or remote relation to it. * * * It would be absurd to hold that the directors, under the idea of incidental powers, might do everything

which they thought would bring passengers to the road. Such a limit is no limit. If they could do this under such a pretense, they could, by direct appropriation of the company funds, build manufacturing villages along the road, and run steamboats to New York, for this might increase their business." It would be going very far to say that a charter authorizing a corporation to manufacture and sell the products of its manufacture will also authorize the selling of the manufactured products of a wholly different corporation for the hope of profit. The contract is ultra vires. In so far as it is executory it is void. The balance said to be due constitutes no claim on the fund.

2. Is the 10 per cent. attorney's fee provided for in some of the notes chargeable upon the fund? It has been held in South Carolina that provision made in a note for the payment of a commission to an attorney in case of suit is perfectly legal and binding. Branyon v. Kay, 33 S. C. 283, 11 S. E. 970; Association v. Hoffman, 50 S. C. 303, 27 S. E. 692; Bird v. Kendall, 62 S. C. 192, 40 S. E. 142. And if, by order of a court of equity, individual suits are enjoined, a creditor who comes in by an attorney, and proves his claim, is entitled to the benefit of this provision. Westfield v. Westfield, 13 S. C. 485. Any creditor who is represented by an attorney, and whose note contains such a provision, is entitled to receive dividend on the value of his note, and, in addition, 10 per cent. on the actual amount of the dividend as fee for his attorney.

3. It follows that the fee of the complainant's solicitor cannot be allowed out of the fund.