## POMERENE v. SCHOOL DIST. NO. I, CITY OF PLATTSMOUTH, NEB.

(Circuit Court of Appeals. Eighth Circuit. March 28, 1923.)

No. 6042.

Sales ⬧279—Where owner selected boiler under contract for heating plant, guaranty of capacity by contractor held inapplicable.

Under a contract to furnish and install a heating plant for a school building, a provision of the general specifications for a guaranty by the contractor of the capacity and efficiency of the plant *held* not applicable, where the school board, under a right reserved, substituted a boiler of its own selection for the one named in the contract, and it proved of insufficient capacity.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action at law by Margaret E. Pomerene, administratrix of the Estate of Louis W. Pomerene, deceased, against School District No. 1, City of Plattsmouth, Neb. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

T. J. Doyle, of Lincoln, Neb. (P. R. Halligan, of Lincoln, Neb., and J. A. C. Kennedy, Yale C. Holland, G. L. De Lacy, and C. F. McLaughlin, all of Omaha, Neb., on the brief), for plaintiff in error.

W. T. Thompson, of Lincoln, Neb., and C. A. Rawls, of Plattsmouth, Neb., for defendant in error.

Before LEWIS, Circuit Judge, and POLLOCK and SYMES, District Judges.

LEWIS, Circuit Judge. After becoming a resident and citizen of Oregon, Louis W. Pomerene instituted this action, gave his deposition and shortly thereafter died, whereupon it was revived in his administratrix. He made a contract in May, 1917, with the defendant school district to furnish material and do certain plumbing and furnish material and do the necessary work to install a heating plant in the new high school building at Plattsmouth, Nebraska; and he began this action in 1920 to recover an alleged balance due him, made up of the amount of his bid and extras which he claimed he was directed to furnish and did furnish at the building, after deducting what had been paid him. His bid for the heating plant and plumbing, and his contract made pursuant thereto, show that he was to be paid $9,930.00, but the extras which he claimed to have furnished and put in brought the total amount up to $18,427.05. In his complaint he allows $13,801.33 as credits for payments as the work progressed, and asked judgment for $4,625.72, the balance. There was no serious dispute about the extras nor amounts claimed for them, but by answer and cross-complaint the school district denied liability and it asked judgment against Pomerene for $6,055.48; its contention being that the plant would not heat the building, that the school district was compelled to take out the boiler that Pom-

⬧For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
288 F.—10

erene had installed and replace it with one of larger capacity in order to make it serviceable, which it did at an expense to it in the amount which it sued for in its cross-complaint, and that Pomerene was liable to it therefor under a provision in the architect's specifications which were made part of the contract by reference, reading thus:

"The contractor must guarantee the perfect operation of the plant in every detail. That it will fill and circulate with steam in all its parts at once and at the same time with a pressure of not to exceed one-half pound. And that there will be no waste of either steam or water. That the apparatus will be noiseless in operation and maintain a temperature of 70 degrees when the outside temperature is 20 degrees below zero, provided the building is kept reasonably tight."

At the close of the trial both sides moved for a directed verdict and the trial judge, being of the opinion that Pomerene was bound by the guaranty, on that ground alone overruled plaintiff's motion and sustained defendant's, whereupon verdict and judgment went for defendant on its cross-complaint for $6,000.00. There is no doubt that the boiler installed by Pomerene was too small for the service required. It did not fulfill the guaranty. It did not keep the building sufficiently warm in cold weather for occupancy. But unless Pomerene was bound by the guaranty there is nothing to sustain the verdict and judgment. We think he was not bound and that the district judge committed an error in law in holding that he was.

The reasons for our conclusions are these: There are two sets of specifications embodied by reference in the contract, and referred to in the latter as general and technical specifications. The general is lengthy, containing more than one hundred numbered paragraphs; the technical describes in detail the heating system and plumbing which was intended to be put in. It contains the guaranty clause above-quoted. As to the boiler, the technical specifications required prospective contractors to make alternate bids:

(1) "Furnish and install one Ideal s48–10 or equal, cast iron sectional boiler. * * * Boiler to have rated capacity of not less than 9,376 sq. ft."; and (2) "Substitute in place of s48–10 Ideal Boiler two s48–8 Ideal, or equal, boilers, together with the necessary trimmings and coverings."

With the two-boiler alternative a fan system was required, which greatly increases the heating capacity. The proof is convincing that a boiler of the capacity at which Ideal s48–10 is rated would have comfortably heated the building. The guaranty, as already said, is found in that part of the specification which deals with the Ideal boiler, single or double, or its equal. It was prepared by one capable and experienced in that line. Bids were not taken for more than a year later. Prices of material and cost of labor continued to rise. There was a laudable desire to save for the district. That part of the specification relating to the boiler (and it contained the guaranty and coupled it with a named boiler capacity) seems to have been abandoned in this way: The architect submitted requests for bids on boilers of specified make and size, Herbert and Kewanee, which did not have as high rated heating capacity as Ideal s48–10, and accepted Pomerene's bid for Herbert B–10, rated at 6,500 sq. ft., or Kewanee #16 with a higher rating, and

in the contract it was stipulated that the amount of Pomerene's bid was based on those boilers. There was an option, the contract does not say who might exercise it, as to which of the two should be used. Under the broad powers given the architect in the general specification he could have probably made the selection, but Pomerene ordered the one with larger capacity, Kewanee #16. Before it arrived the district board, exercising through the architect a right reserved to it in the general specification "to make any changes or alterations he may see proper, of the plant, form, dimensions or materials, or the amount or character of the work herein contemplated, or any part thereof, deducting or adding the cost as the case may be to the face of the contract, which amount shall be determined by the parties to the contract or by the architect," wrote and sent to Pomerene this letter:

"This will authorize you to install one (1) #D–14 Herbert down-draft boiler instead of the boiler specified in the above Building. With this change you will receive the sum of $275.00 in addition to the contract price."

This substituted boiler, which Pomerene put in, had less rated capacity than either of the boilers named in Pomerene's bid and contract, but it had a down-draft which neither of those two had, and the inducement to the change was the representation of the Herbert agent to the board that it would effect a great saving in fuel. The board decided to make the change after it held a meeting, at which the Herbert agent was present, and Pomerene also attended at the board's request. Members of the board testified that they told Pomerene they would not take the down-draft boiler unless he assured them it would serve the purpose and heat the building, and that he so assured them. This Pomerene denied. He testified that he told them he had never installed a Herbert down-draft boiler, had never seen one. Members of the board admitted that Pomerene told them that he was not familiar with the down-draft boiler. Some of them testified he made such statements before the meeting, and some that he made them at the meeting. This was the boiler that Pomerene installed and which later had to be taken out. It was replaced with a Kewanee smokeless No. 315, rated at 10,000 sq. ft. It served the purpose. The evidence is uncontradicted that no boiler with a less capacity than 8,000 sq. ft. would heat the building. There were some minor complaints about changes from the specifications made by Pomerene, but most of them, if not all, were authoritatively made; also, it was claimed that some of the plumbing was not properly put in, but that was of slight moment and does not go to the plaintiff's right of recovery. Aside from the admitted incapacity of the boiler the plaintiff's testimony tended strongly to show that there was no ground for objection to material or work.

The guaranty clause was inserted in the specification on the plain assumption and implied condition that bidders had the right to select the boiler which they proposed to put in, and if they did not care to take those expressly named in the specification they would at their own risk select one equal in capacity. It was clearly intended as a security against that risk. But when Pomerene was asked to bid the school district had already made the selection. He was not given the right and opportunity provided in the specification of bidding on the

Ideal of the type and capacity specified, or of selecting at his own risk some other make which, in his judgment, would be of equal capacity. After the contract was made with Pomerene the board, moved by a desire to save fuel, substituted a down-draft boiler, which Pomerene put in, and the record shows that it did so under the right reserved to it in the general specification, as above noted. The board having selected the make and size of boiler on which Pomerene was asked to bid, and then having contracted with him for one or the other of their own selection, we think the purpose of the guaranty clause, in so far as it related to the heating capacity of the boiler, was put aside and did not become a part of Pomerene's contract. Giving to the guaranty clause the meaning and purpose which we think must be attributed to it, the board, after binding Pomerene to put in a boiler which it selected, is not in a position on the facts of the case to complain about its heating capacity. We put out of view the contention that on the assumption of applying the guaranty clause to Pomerene's contract, he was required to do the impossible, to wit, make the boiler selected by the board serve a heat capacity in excess of its heat capacity—and for that reason there could be no legal liability. 2 Chitty on Contracts, 11th Ed. 1073; Jones v. U. S., 96 U. S. 24, 29, 24 L. Ed. 644; Railway Co. v. Hooper, 160 U. S. 514, 527, 16 Sup. Ct. 379, 40 L. Ed. 515. For it is our opinion that the clause cannot be applied to Pomerene's contract. He never made the guaranty, and not being bound by it in his contract, the estimate which it is claimed he gave of the D–14 Herbert down-draft at the board meeting, which he denied, did not make the guaranty clause a part of his contract. On the facts we think the principle of law on which the court directed the verdict wholly inapplicable.

Reversed and remanded.