UNITED STATES of America, Intervenor, Appellant,

v.

SEABOARD MACHINERY CORPORA- TION, Appellee.

No. 16845.

United States Court of Appeals Fifth Circuit.

May 7, 1958.

Rehearing Denied June 30, 1958.

Harrold Carswell, U. S. Atty., Wilfred C. Varn, Asst. U. S. Atty., Tallahassee, Fla., William W. Ross, Melvin Richter, Attys., Paul A. Sweeney, Chief, App. Sec., George Cochran Doub, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., for appellant.

Millard F. Caldwell, Leo L. Foster, Caldwell, Parker & Foster, Tallahassee, Fla., Hans A. Nathan, Charles M. Trammel, Washington, D. C., for appellee.

R. Emmett Kerrigan, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, amicus curiae, for Peerless Ins. Co.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Despite its 528 pages of printed record, exhibits numbering in the hundreds of pages, the complaints, cross claims, counterclaims, extensive pre-trial discovery proceedings, motions for summary judgment, truncated presentation of evidence, and the large dollar amounts at stake, this is a very simple case.

The Government was the Lessor of portions of Wainwright Shipyard at Panama City, Florida to Seaboard Machinery Corporation, the Lessee. The lease required Lessee to procure and maintain insurance against fire in the form and in the amounts specified by the Government. The Lessee did so. The property thus insured was totally destroyed by fire. The Insurer paid the full insured values into the Registry of the Court. In the controversy remaining between Government and Lessee, the Government, the sole assured, sought what the Insurer had agreed to, and did, pay. The District Court, however, after first denying the Government's motion for summary judgment and a trial thereafter on the merits, denied this claim. The Court held that all the Government got was the money equivalent of the "market value" of this war-built installation. Out of some $800,000 of specified insured values, the Government, the admitted owner, got about $200,000. The remaining $590,000 went to the Lessee.

To justify this unusual result, the Lessee takes an elastic approach. The first is that even though this outcome may be wrong, the Government must fail here because the present appeal is contrary to the theory and position asserted by the United States Attorney in the trial below. Reduced to more tan-

gible terms, it is that here and there in the colloquy between the Court and counsel which covered two years' time and consumes as much, if not more than, the testimony itself, the United States Attorney agreed that the issue for trial was the "fair market value" of the properties. A fair reading of the record is convincing that these isolated statements never misled the Court as to the Government's position and when made, were made in response to the contemporary situation created by the preliminary ruling, later made formal by the denial of the Government's motion for summary judgment, that all that the Government was "entitled to recover * * * [was] * * * the full marketable value of the property owned by it and destroyed in the fire, and [Lessee] is entitled to its day in Court to have such value established by the Court." By its formal complaints, by the motion for summary judgment and the supporting papers, by memoranda and running objections, the Government took and relentlessly held fast to its simple contention that what Lessee had agreed to do, and had done, entitled

it to the full specified agreed insured values. That it had to adapt [1] itself to the exigencies of the Court's adverse rulings does not convict it of changing horses in mid-stream.

The Lessee must therefore face the intrinsic merits, and these, we believe, reveal that the decision below is clearly erroneous and may not stand.

In a capsulated form, Lessee's contentions are: Since the lease limited accountability to the condition of the premises reflected by the Joint Inventory and Condition Survey [2] Report of December 22, 1951, and required merely that on termination that the property be restored less ordinary wear and tear or, in lieu thereof, Lessee should " * * * pay the Government money in an amount sufficient to compensate for the damage sustained by the Government." [3] Lessee's liability thereunder would be the fair market value of the premises. Additionally, since liability for breach of an agreement to procure specified insurance may be merely the market value of the uninsured property destroyed,[4] the cate-

1. As a matter of fact, after many times ruling that the "market value" was the measure of the Government's interest in the policy proceeds and allowing the Government to make proof on this, the Court surprisingly rejected as immaterial and irrelevant rather elaborate appraisal evidence prepared and proffered by Lessee. By this stage of the proceedings the Court apparently thought that "market value" was to be measured solely by "fair sales price" reflected in two GSA appraisals.

2. The lease provided:
   "Article Six. Assumption of Responsibility and Accountability:
   "(a) Of Leased Premises:
   "Lessee agrees that on September 4, 1951 it took possession of and assumed accountability for that portion of the leased premises * * * and that it will assume possession of and accountability for the balance of the leased premises upon the date of the execution of this lease. Lessee further agrees that its responsibility and accountability for the entire leased premises shall be based upon a Joint Inventory and Condition Survey Report, as of December 22, 1951, signed by * * * Seaboard Machinery

Corporation and * * * General Services Administration."

3. "Article Seven. Termination Joint Condition Survey Report and Inventory:
   "At the expiration, termination, revocation or cancellation of this lease, a Final Joint Condition Survey Report and a Final Joint Inventory shall be made and executed by authorized representatives of both parties. Should the Final Joint Inventory disclose any property to be unaccounted for, or worn or damaged in excess of ordinary wear and tear, Lessee agrees to make replacement to the satisfaction of the Government, or in lieu thereof, to pay the Government money in an amount sufficient to compensate for the damage sustained by the Government."

4. The brief of R. Emmett Kerrigan, Esq., amicus curiae, asserts this to be the general rule: "Thus, even without regard to the provisions relating to responsibility [Articles six and seven, notes 2 and 3, supra] for destroyed property, Seaboard would have been liable only for the value of the lost property" and for this cites Ann.Cas.1918E, page 304; Jacksonville, M. P. Ry. & Navigation Co.

gorical agreement of Lessee to procure insurance [5] in the amount stated gave it the excess of insurance proceeds over the current market values unless the Government used the proceeds to restore the premises.

We think this confuses too many things and assumes that this fire insurance was required not primarily for the protection of the Government's interest, but for the equal benefit [6] of both Government and Lessee. The Government, as owner of these premises, previously designated by the Department of Defense

v. Hooper, 1896, 160 U.S. 514, 16 S.Ct. 379, 40 L.Ed. 515; Franck v. Stout, 1909, 139 Wis. 223, 120 N.W. 867; Bentley v. Fayas, 1951, 260 Wis. 177, 50 N.W. 2d 404, 29 A.L.R.2d 205; First National Bank in Tarpon Springs v. Bliss, Fla.1952, 56 So.2d 922.

5. "Article Twelve. Insurance:

"During the term of this lease * * * Lessee shall furnish and maintain at its own expense, Fire and Extended Coverage Insurance, * * * in such *amounts*, with such carriers and in such *form* as the Lessor shall approve. Policies evidencing such insurance shall show the United States of America, acting by and through the Administrator, General Services Administration, *only* as the *insured*, and shall provide for payment, in the event of loss, to the Treasurer of the United States for the account of all interests. Policies shall further provide that the insurance companies agree to notify the Regional Director, General Services Administration, 303 Federal Annex, Atlanta, Georgia, thirty (30) days prior to any reduction in the amount or cancellation of the insurance.

"In the event of damage or destruction of the leased premises in whole or in part by fire or other causes beyond the Lessee's control, the Secretary of Defense *shall determine* whether the destroyed or damaged buildings or facilities shall be *restored*. If the damage is to the extent that it renders any buidings or facilities wholly untenantable, and it is determined *not to restore* such buildings and facilities, the Lessee shall have the right, upon ten (10) days' notice in writing to the Government, to cancel this lease as to the premises rendered untenantable, and the portion of the rental applicable to such premises, as determined by the Government, shall be

as a part of the National Industrial Reserve,[7] the Government had, as would any prudent private owner of property, several legitimate business interests which were fulfilled by these lease provisions. First, it desired to exact careful maintenance and upkeep of the premises during the lease term. The consequence for failure to maintain or restore the property would be the obligation to make good the Government's loss, in that case the market value of the premises. But in addition to the contractual security of the financial obligation of the Lessee, the Government wished to make cer-

abated effective as of the date of the damage or destruction. * * *" (Emphasis supplied)

Significantly, this clause after stating a sweeping hold harmless agreement also required Lessee to procure and maintain specified *liability* insurance in which *Lessee* was to be the named Assured with the Government named as an additional Assured.

6. Lessee no longer seriously maintains what it stressed so long below that actual naming of "Seaboard Machinery Corporation and the United States of America, acting by and through the Administrator, General Services Administration" as the assureds in the previous cancelled policies and the binders effective on the date of the fire, December 2, 1952, enhanced Lessee's rights. It now recognizes that this was in violation of the terms of the contract, note 5, supra, as well as the applicable insurance regulations, War Assets Administration, succeeded by the General Services Administration, Section 105 Federal Property and Administrative Services Act of 1949, 63 Stat. 377, 381, 5 U.S.C.A. § 630c. It now recognizes that its rights are as though the Binder named the United States only as the Assured with the loss payment clause reading: "Payment, in the event of loss, to the Treasurer of the United States for the account of all interests."

7. National Industrial Reserve Act of 1948 (62 Stat. 1225, 50 U.S.C.A. § 451 et seq.). Under Section 4 the property could only be leased or sold subject to a National Security Clause and under Sections 6 and 7, the Secretary of Defense was given a continuing responsibility for preservation of property leased or sold subject to a National Security Clause. This included insurance.

tain that if the premises were destroyed or substantially injured by recognized likely perils, it would have the security [8] of insurance in the amounts and forms specified by it.

The Shipyard belonged to the Government. It was deemed a part of the essential reserve system for national defense. It was, therefore, eminently proper and good business judgment for the Government to exact the right, and then exercise it, to prescribe insurance in an amount which was the equivalent of cost of reproduction less depreciation.[9] And there can be, of course, no doubt that this was precisely what the Government demanded and obtained.[10]

As the Lessee undertakes its claim to nearly three-fourths of the proceeds of the agreed amount of insurance, the route is a devious one. It seems to be that to have required this insurance was unfair since this put an extraordinary and excessive insurance premium burden on the Lessee for insurance in amounts far exceeding the real value. And, in addition, the Lessee had itself spent several hundred thousand dollars in rehabilitating the properties and in making improvements to put the war-weary plant in shape for use. The first is irrelevant since the contract, note 5, supra, and the requirement letter, note 10, supra, obligated the Lessee in the plainest terms. The second was contrary to the equally plain terms of Article 8 by which Lessee took the property "as-is where-is" with the Lessee being obligated " * * * at its own cost and expense [to] undertake and perform any and all action which may be necessary in the conditioning and reactivation of the leased premises for its use."

Lessee seeks to overcome the palpable weaknesses in these contentions by insisting that the option to purchase,[11] the mechanism [12] of which they set in motion

8. This likewise eliminated the troublesome uncertainties under the law of landlord-tenant or bailments on whether damage from any such cases was "beyond the control" of the lessee (Article 12), note 5, supra, for which Lessee might have a burden of disproving fault on termination and redelivery (Arts. 6, 7, notes 2, 3). The amicus curiae brief points out that even though Licensee was not named as an assured, note 6, supra, the fire insurance procured by it would afford it protection against damages within the policy coverage since the insurers could not maintain subrogation against Lessee after payment to the named Assured, the Government. It cites: Phoenix Ins. Co. v. Erie & Western Transport Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873; Globe & Rutgers Fire Ins. Co. v. Hines, 2 Cir., 273 F. 774, certiorari denied 257 U.S. 643, 42 S.Ct. 54, 66 L.Ed. 413; Builders & Manufacturers Mutual Casualty Co. v. Preferred Auto Ins. Co., 6 Cir., 118 F.2d 118; Louisiana Fire Ins. Co. v. Royal Indemnity Co., La.App., 38 So.2d 807; see 8 Appleman, Insurance Law and Practice, § 4056, pp. 539–541; Howell v. Globe & Rutgers Fire Ins. Co., 133 Misc. 193, 231 N.Y.S. 67.

9. The regulations prescribed: "The amount of insurance shall be determined with the concurrence of [the] Regional Director, in accordance with policy provisions, on the basis of present day reproduction costs, less depreciation, plus the insurable value of any improvements or betterment. * * *"

10. As particular buildings, facilities or equipment were added to or temporarily withdrawn from the lease, various supplements were executed which required review and revision of the insurance program. By letter November 20, 1952, shortly before the fire, the Government required fire insurance for particular stated amounts on the buildings subsequently destroyed aggregating $598,675. Binders for that amount were confirmed by underwriters on December 8, 1952.

11. Lessee was granted an option to purchase all, but not part of, the premises during the extended period of the lease subsequent to September 3, 1954, and prior to June 4, 1957, at the fair value thereof subject, however, to the approval of the Secretary of Defense and any conditions prescribed by him.

12. On August 14, 1952, Lessee declared that it exercised the right to buy the Shipyard for the fair value thereof fixed by it at $550,000 payable 10% down and balance over ten years subject to the National Security Clause. October 6, 1952, the Government replied that upon receipt of a proposal for a purchase at a price of $765,000, subject to National

but never finally consummated, gives a special relevance to the appraisal survey of September 30, 1952. This appraisal survey was made in the fall of 1952 to determine the fair sales price for the whole Shipyard and its equipment either subject to or free from the NSC. With respect to the properties with specified insured values aggregating $598,675, note 10, supra, this appraisal, for each of those buildings subsequently destroyed, showed a fair sales price aggregating $146,400. For the personalty and equipment with a specified insured value of $200,000, of which a total of $164,620 was subsequently destroyed, the appraisal showed a fair sales price of $100,361 for all of it, and $54,526.01 for that part destroyed in the fire. It was on this appraisal that the Court limited the Government's interest in the proceeds to $146,400 and $54,526.01, respectively, see note 13, infra.

The option, as it was called, was of no significance on the insurance. The right of the Secretary of Defense, in the exercise of his duty to reject all offers or proposals on the basis of national security requirements, destroyed its enforceability. The appraisal survey was nothing more than spectacular evidence of the sharp difference between insured values and market or sales value if the Lessee was right on its legal theory.

Indeed, it is this sharp difference and the unwarranted specifying of Lessee as a named assured which demonstrates the wisdom, reasonableness, and the legal validity of the insurance clause of this lease. If the Lessee, either on some theory that it had spent sums to improve or add to the property, or had acquired some elusive unenforceable rights under an option entitling it to negotiate for a purchase, is allowed to claim an interest in the very insurance demanded by the Lessor, the Lessor has not obtained the protection it sought. As insurance limits remain constant once specified, instead of recovering cost of reproduction less depreciation, the Government would have only the right to litigate the difficult question of market value of a facility having none in fact and as to which the reconstruction of a "market value" would exhaust the full storehouse of appraisal techniques. Not only will the Government as Lessor have lost the protection sought, it will have lost it by the curious fact that having exacted performance of the Lessee and the Lessee having performed, the Lessor gets no more than it would had the contract been silent.

The Lessee acknowledges, as it must, that had the Government used the money to restore the premises, see note 5, supra, the Lessee would be entitled to none of the proceeds. Lessee reasons that it would have realized the benefit of this. But this is illusive for the lease had a 90-day unrestricted cancellation clause and with the option to purchase necessarily so carefully hedged, the Lessee could not have counted on any such benefit. If, as is conceded, the property owner had the right to the control and use of the funds for its unlimited, exclusive, future use in restored properties, it had the right as well to specify that it alone should get the proceeds and determine as it saw fit how money received as reimbursement for its lost property would be spent.

The contract was to procure insurance in a stated amount. The Lessee did this. The insurers were anxious to, and did, pay. What the Lessee promised it would obtain for the Government, the Government is entitled to have. The Lessee can

Security Clause, payable 20% down and the balance in ten years, the matter would be submitted to the Munitions Board for consideration whether sale would be made and the National Security terms to be prescribed therefor. No response was made to this until August 21, 1953, long after the fire and the day after the filing of these suits against the insurance companies by Lessee. In that letter Lessee declared it was accepting the offer of October 6, 1952, for sale at $765,000 subject to NSC. On October 23, 1953, the Government rejected this for numerous reasons including destruction of the premises by the fire and the total failure of the Secretary of Defense to approve the proposal.

claim nothing for having done what it promised to do.

The judgments are reversed and rendered [13] for the Government.

Reversed and rendered.

CAMERON, Circuit Judge, concurs in the result.

On Petition for Rehearing.

PER CURIAM.

By a vigorous petition for rehearing lessee asserts that adoption by us of the Government's contentions in complete reversal of its position taken below in this protracted case is a denial of due process. It argues that the "waiver" or "abandonment" by the Government of other issues and submission to the trial of the one fixed by the District Court amounted to a solemn stipulation, the effect of which, in the light of our reversal and rendition, is to have deprived lessee of the opportunity of presenting evidence on (a) the nature and exercise of the option to purchase, (b) naming itself as a joint assured in the fire insurance policies, (c) the replacement insurance value of the real property, and (d) the extent of damage to and the replacement insurance value of personalty.

■■ We need not further determine whether this was a change of position, a waiver or stipulation. For in neither case can evidence respecting (a) alter the lease contract and the requirements of the National Industrial Reserve Act, see note 7, concerning the option to purchase and the undisputed fact that as there required, consent by the Secretary of Defense was never given, see note 12. For (b) the same is true of the plain, positive requirements of Article Twelve of the Lease requiring the United States be the sole [1] named assured, see note 5.

■ Nor is anything left for proof with respect to (c) replacement value of realty. Pursuant to Article Twelve of the Lease, the Government by formal letter specified the exact dollar amount of insurance to be obtained for each building, and this precise amount was insured in the policies and subsequently paid by the Insurers, see note 10. It matters not whether actual replacement costs less depreciation was more or less.

■ As to (d) value of personalty, while there was no schedule as in the case of realty fixing in advance the precise amount of insurance aggregating $200,000 with respect to each item, the District Court in its opinion, by language which we paraphrased in note 13, held that the Government's " * * * claim of $164,620 for personal property * * represents the full amount of insurance coverage placed upon the personal property of [Government] destroyed by the fire." There was sworn testimony by a competent appraisal expert who, on behalf of the insurance companies, had actually checked and approved for payment the Government's detailed Proof of Loss for this precise sum, that the insurable value for each item destroyed or damaged, as well as the total, was a con-

13. In Civil Action 420, the amount in the Registry is $191,700. The District Court allowed the Government $54,526.01 with the balance of $137,173.99 being adjudged to Lessee. The specified insured value of the personalty and equipment damaged in the fire was $164,620. The Government is entitled to this sum.

In Civil Action 421 covering the real property, the total amount deposited by the insurers, $578,400 plus the sum of $20,200 deposited by Lessee for unpaid premiums and salvage value of building scrap aggregated $598,600. The District Court allowed $146,400 to the Government with the balance of $452,200 to Lessee. The entire sum of $598,600 shall be paid to the Government.

1. Indeed, in its original brief, (page 44) Seaboard acknowledge, as we pointed out in note 6, that the rights had to be determined as though the United States were alone named:

"All insurance policies, in fact, named both Seaboard and the Government as assured, but in law it would have made no difference, if only the Government had been named, for the insurance money would then have been paid to the Treasurer of the United States 'for the account of all interests', i. e., as a fiduciary."

servative figure on the basis of replacement cost less depreciation. No attack was made on this evidence save to have the witness acknowledge that he was stating the insurable value on this formula and not the present market or fair sales price value.

Petition denied.

CAMERON, Circuit Judge, concurs in the result.