## CONSUMERS' GAS TRUST CO. v. QUINBY.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1905.)

### No. 1,099.

1. FEDERAL COURTS — JURISDICTION—STATUTES—APPLICATION—CORPORATIONS—STOCKHOLDERS—ULTRA VIRES BUSINESS—ACTIONS.

Rev. St. § 629 [U. S. Comp. St. 1901, p. 508], declaring that federal courts shall not have jurisdiction of an action on an assigned claim, unless suit might have been brought in the absence of an assignment, does not apply to a bill by a nonresident stockholder of a corporation, who acquired his stock by assignment from a resident of the state where the corporation was domiciled, to restrain the latter's directors and trustees from using the corporate assets for an alleged ultra vires business, affecting complainant's interest only in common with all other stockholders.

2. SAME—STOCKHOLDERS' SUITS—COLLUSION.

That a stockholder of a corporation was acting in concert with other stockholders in suing in the federal courts to enjoin the alleged use of corporate assets in an ultra vires business, which other stockholders were citizens of the same state as the corporation, and that they contributed

to the expenses of the suit, did not affect the court's jurisdiction, or establish that the suit was collusive, within equity rule 94, requiring every bill by one or more stockholders against the corporation, etc., to allege that the suit is not collusive, in order to confer jurisdiction on a federal court; it appearing that the majority stockholders and directors were opposed to the objects of the bill.

3. SAME—VERIFICATION.

Where a bill by a stockholder to restrain the use of corporate assets in an alleged ultra vires business was amended by leave of court, in order that it might be verified by complainant personally, it was immaterial that the original verification was made by another.

4. SAME—STATE AND FEDERAL COURTS—CONFLICTING JURISDICTION—SUITS IN PERSONAM.

A noncitizen stockholder was entitled to maintain a suit in the federal courts to restrain the use of corporate assets in an alleged ultra vires business, notwithstanding the pendency of two prior suits for similar relief in the state courts; all of the suits being in personam, and there being no conflict over property in custodia legis.

[Ed. Note.—Conflict of jurisdiction between state and federal courts, see note to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.]

5. SAME—DECISIONS OF STATE COURTS—CONTROLLING AUTHORITY.

The decisions of the highest courts of a state, interpreting state statutes under which a corporation was organized, are controlling on the federal courts.

6. SAME—TRUSTS—RIGHTS OF STOCKHOLDERS.

Where a business corporation was organized to mine and sell natural gas to the residents of a city, the fact that the stock subscription contracts required repayment of amounts paid by subscribers, with interest and that after such payment the corporation should reduce the price of gas to consumers to cost, without further dividends to shareholders, and that the entire capital stock was under the voting power and control of five trustees, selected from the stockholders, did not deprive the latter of their character and rights as such on payment of their subscriptions, with interest, and hence, on the termination of the corporation's business by the supply of natural gas becoming exhausted, they were entitled to have the corporation dissolved and its assets distributed to them.

7. CORPORATIONS—ORGANIZATION—NATURAL GAS COMPANIES—POWERS.

Rev. St. Ind. 1881, c. 35 (Burns' Ann. St. 1901, § 5051), provides that persons desiring to carry on any kind of manufacturing, mining, mechanical, or chemical business, etc., shall make, sign, and acknowledge a certificate in writing, stating the corporate name, the object of its formation, its capital stock, etc., and file the same with the recorder of the county and a duplicate in the office of the Secretary of State. Defendant corporation was organized "to drill and mine for natural gas, petroleum, and other minerals, and to purchase, lease, and otherwise acquire gas and petroleum wells, and the products thereof, to furnish the same to its patrons for use, and by manufacture to convert the same into gas for fuel and illuminating purposes, and other articles of commerce," after which the organizers of the company procured the passage of Burns' Ann. St. 1894, § 5099, defining the word "mining," as used in the former statute, to "cover and include the sinking, drilling, boring, and operating of wells for petroleum and natural gas," and made it applicable to the organization in question. *Held*, that such corporation had no power, after the supply of natural gas was exhausted, to use its assets to manufacture artificial gas and furnish the same to consumers.

8. SAME—STATUTES—AMENDMENT.

The undertaking to manufacture contained in defendant's certificate of incorporation being merely incidental to the mining business for which the corporation was organized, the right to manufacture artificial gas was

not conferred, as against dissenting stockholders, by Acts 1903, p. 147, c. 73, declaring that the articles of incorporation of any company having filed a certificate under Act May 20, 1852, or any of its amendments or supplements, wherein the object of the company has been stated as embracing any or all of the purposes of any one of the subdivisions of section 1 of the act, were thereby legalized and declared to be as effectual as if the original statute and all its amendments had stated that companies might be formed thereunder for any and all of the purposes therein enumerated.

Grosscup, Circuit Judge, dissenting in part.

Appeal from the Circuit Court of the United States for the District of Indiana.

This cause was submitted upon the bill and answers as amended, and the appeal is from a final decree which sustains the bill and grants the relief sought against the appellants (defendants therein), the Consumers' Gas Trust Company and its trustees and directors, respectively.

The appellee (complainant), Byron C. Quinby, avers that he is a citizen of the state of Massachusetts and the owner of shares of capital stock in the Consumers' Gas Trust Company "to the amount, par value, of $3,499.85," and "sues on behalf of himself and all others similarly interested," and that the "suit is not a collusive one to confer on this court jurisdiction of a case of which it would not otherwise have cognizance." As originally filed the bill was not verified by the complainant personally, but by George H. Evans, on information and belief. Subsequently it was verified by complainant, under leave of court; but the amended bill was verified only by Evans, as on information and belief. The defendants are citizens of Indiana; the Consumers' Gas Trust Company being a corporation organized under the laws of that state and having its principal place of business at Indianapolis. Substantially the following facts and circumstances are stated in the bill and amendment:

On June 27, 1887, the common council and board of aldermen of the city of Indianapolis adopted an ordinance, which was approved by the mayor, authorizing the use of the streets of the city for mains, pipes, and conduits for the purpose of supplying natural gas to its inhabitants at a schedule of prices therein specified, and requiring that any corporation or company should file with the city clerk its written acceptance of the ordinance to obtain the benefits thereof. On November 2, 1887, the defendant Consumers' Gas Trust Company was incorporated for the purpose of operating under such ordinance, under a general statute of Indiana providing for the organization of manufacturing and mining companies, by the adoption of articles of association which provide substantially as follows: "The objects of the formation of such corporation are to drill and mine for natural gas, petroleum, and other minerals, and to purchase, lease, and otherwise acquire gas and petroleum wells and the product thereof, and to furnish the same to its patrons for use, and by manufacture to convert the same into gas for fuel and illuminating purposes and other articles of commerce, and the sale of the product to its patrons," and to these ends to take, hold, convey, and mortgage real estate by fee simple or lesser title, and to own, operate, and maintain such machinery, works, lines of pipe, and appliances as the carrying out of the object above mentioned may require. That the capital stock of the company should be $500,000, to be divided into shares of $25 each. That the term of existence of the corporation should be 50 years. That the business and prudential concerns of the corporation should be managed by a board of directors, consisting of nine members, to be, after the first year, annually elected by the board of trustees hereinafter provided for. That "the entire capital stock of the corporation shall be placed under the control of a board of five trustees and their successors, who shall be stockholders in said company, which said board of trustees shall have full, complete, exclusive, and irrevocable power during the continuance of this

corporation to hold said stock and to vote the same as fully and completely as if they were the owners of said capital stock, to elect directors as above provided, and to fill any vacancy that may occur in said board of directors. Said entire capital stock shall be voted as a unit, and, in case said trustees shall not agree as to how said stock shall be voted, the majority of them shall cast the vote of the board. If a vacancy should occur in the board of trustees by death, resignation, removals from the city of Indianapolis, or otherwise, such vacancy shall be filled by the remaining members of the board; and, in the event of the failure of such board to fill such vacancy, the Marion circuit court shall, upon application of any stockholder, after said trustees shall have had ten days' notice in writing of such application and shall have in the meantime failed to fill such vacancy, appoint some competent person to fill the same." That "said trustees shall issue to each subscriber to the capital stock of said company, upon full payment by each subscriber to said company of the amount of his subscription, and upon the stock therefor being issued to said trustees as above provided, a certificate, showing the amount of stock held by said trustees in trust for said subscriber; and said subscriber, or holder of said certificate by assignment, shall be entitled by virtue thereof to receive from said company all dividends which shall be earned by said stock, which dividends, not to exceed eight per cent. per annum so long as the certificates of the indebtedness of the company are not fully canceled, shall be paid in money, or may be applied in payment of any indebtedness of said holder to the company as a consumer of gas." That "when said certificate holder shall have received, by dividends or otherwise, on said certificate, an amount equal to his subscription, with interest at the rate of eight per centum per annum thereon and after the payment of all indebtedness of the said company, then it shall be the duty of the directors of said company to reduce the price of gas so that the same shall thereafter be supplied to consumers at cost." That "for the purpose of the development of the supply of gas and the construction of pipe lines, the board of directors shall have power to borrow money for the use of the company, and to issue therefor certificates of indebtedness, bearing interest at a rate not exceeding eight per centum per annum." That "no indebtedness except for current expenses, shall be contracted by the board of directors in any other form than the certificates above mentioned, without the consent of the board of trustees herein above provided for, acting for the stockholders; and no indebtedness of any kind shall be contracted, except on the consent of two-thirds of said board of directors." That "the principal place of business of the company shall be Indianapolis, Marion county, Indiana."

A board of directors was named in the articles to serve for the first year. Such board adopted by-laws which provided: That the secretary should "keep correct accounts, in books provided for that purpose, of all the dealings of the corporation with its stockholders, officers, creditors, and patrons, according to such system as may be provided by the board of directors. He shall attest and affix the corporate seal to all stock certificates, and keep a complete and careful record of certificates issued by the trustees to the subscribers to the capital stock and their assigns." Also that "the committee on private consumers and rates shall attend to the business of fixing a schedule of prices, subject to the approval of the board of directors, at which gas shall be supplied to private consumers within the limits of the city of Indianapolis, and shall hear and decide on all complaints and grievances of said consumers, subject to the approval of the board of directors. If at any time said committee shall deem it advisable to furnish gas to private consumers at less rates than is provided in the city ordinance now in force on that subject, they shall report their recommendation in that behalf to the board of directors." Also that "at the first regular meeting in November of each year the board of directors shall request of the trustees in writing the appointment of a committee of three stockholders, other than directors, to make thorough and careful examinations of all accounts of the company and verify the same; said committee to have the power to appoint such expert accountants as may be necessary." The board of directors then proceeded to solicit subscriptions for shares of the capital stock of the company, and with the consent of the board of trustees adopted a printed form

for such subscriptions. All subscriptions to the capital stock, both as orig-. inally fixed and as subsequently increased by amendment, were made upon the form so adopted. Upon the payment of subscriptions the company "issued. to each such subscriber, to evidence his interest in said company by virtue of his said subscription and payment," what is called a "final certificate." The subscription form referred to contains this agreement: "I hereby agree, that the stock above subscribed shall be issued to the board of trustees above named in perpetual and irrevocable trust, in the manner and accord-. ing to the terms and conditions of the articles of incorporation under which said company is organized, and that when the indebtedness of said company is fully paid and the subscribers to stock shall have received an amount equal to the amount by them subscribed and paid, with eight per cent. interest, that the price for gas supplied by said company shall thereafter be fixed at cost." The subscription agreement also contained the names of the board of trustees and of the board of directors selected for such purposes.

The final certificate referred to as issued to the subscribers, after stating the name of the subscriber, his payment into the treasury of the company of the sum stated "in full payment, satisfaction, and discharge of his subscription to the capital stock of said company, and that his said subscription is hereby canceled," recites as follows: "In consideration of the payment of the above-named sum of money the Consumers' Gas Trust Company hereby contracts and agrees that after the payment of all indebtedness of said company, contracted for supplies, leases, materials, labor, and the construction of pipe lines and gas wells, all the net earnings of said company shall be applied pro rata to the repayment to the subscribers or their assigns of all fully paid subscriptions to the capital stock of said company until all the same are repaid in full, together with interest thereon at the rate of 8 per centum per annum; interest to be calculated from the date of payment of each several installments of all fully paid subscriptions to the said capital of said company. Said company, in consideration of the payment of said sum of money herein above named, further hereby contracts and agrees that after all indebtedness of said company, contracted for supplies, leases, materials, labor, and the construction of pipe lines and gas wells, is fully paid, and after all fully paid subscriptions to the capital of said company are repaid to the subscribers, or their assigns, together with interest thereon as herein above provided, the said the Consumers' Gas Trust Company will reduce the price of gas so that the same shall thereafter be supplied to all. patrons of said company at its actual cost. For and in consideration of the contracts and agreements of said company herein above set forth, and for and in consideration of the great and permanent benefit to the entire community of the city of Indianapolis to be derived from having natural gas supplied or furnished at its actual cost, ———, by the acceptance of this certificate, hereby contracts and agrees, for himself and his assigns, that the capital stock of said company, issued to the board of five trustees thereof in shares of $25 each, based on the payment of the subscription to the capital of said company hereinabove mentioned, shall be and remain under the exclusive and irrevocable control of said board of five trustees and their, successors, with full, complete, exclusive, and irrevocable power in said board of trustees to hold said stock and to vote the same during the continuance of the Consumers' Gas Trust Company as a corporation, for all the uses and purposes in the articles of incorporation of said company mentioned, set forth, and described."

Subscriptions to the capital stock were made accordingly for the amount authorized, which were paid and certificates issued in the form mentioned. Thereupon the company proceeded to acquire leases of natural gas territory in the then newly discovered gas fields of Indiana, drilled wells to obtain such gas, and constructed a line of mains and pipes to the city of Indianapolis, and a system of natural gas mains and pipe lines in the streets and alleys of that city, and was thus enabled to and did convey natural gas to Indianapolis, and entered upon the distribution of the same to the inhabitants. The authorized capital was found insufficient, and, after borrowing additional sums, an amendment of the articles was made, providing for an increase of the stock to $1,600,000; the resolution for that purpose stating

that the increase was "for the purpose of raising money to fully complete and equip the plant for supplying the entire city with natural gas." Subscriptions for the increased capital stock were made to the amount of $105,-000, and, on payment thereof, like final certificates were issued to the subscribers, and the entire additional amount was invested in the construction and extension of the plant. On November 29, 1892, the directors of the company voted to convert the interest, at the rate of 8 per cent. per annum, which had accrued and should accrue to January 1, 1893, on the amount of capital stock, into shares of capital stock of equal amount, and to issue certificates therefor to the holders of certificates, in like form with the original certificates, and, such arrangement being carried out, the capital stock was thereby increased to $789,000, and no further addition thereto was ever made.

The bill further avers: "It was contemplated at the time of the organization of said company, and was a principal inducement to the organization thereof and the subscriptions to its capital stock, that the supply of natural gas for Indianapolis would be obtained permanently, or at least for many years, from a part of the natural gas fields within a distance of about 25 miles from said city, and at small expense, so that the receipts of the company from the sale thereof at the rates prescribed in the said ordinance of June 27, 1887, would be so largely in excess of operating expenses that the company would be able to pay all debts contracted for money borrowed to construct its plant, and interest and dividends on its shares of capital stock, and such dividends would equal the par value of such shares long before the supply of natural gas had failed, or the cost of supplying the same had materially increased, and that thereupon it would become practicable for said company to reduce the price below that prescribed by said ordinance, and thereafter supply the same to the inhabitants of the city at cost, which it was contemplated would be less than the maximum price fixed by said ordinance." Also that: "It was well known, at the time of the organization of the Consumers' Gas Trust Company, that petroleum was often, if not usually, present underlying gas deposits, where such deposits were found in rock formation such as that in which the Indiana natural gas deposits were found, so that it was anticipated, at the time of the organization of said company, that, in drilling its wells for natural gas, petroleum might or would be found, be produced by such wells when the natural gas deposits reached thereby should be exhausted or diminished, and that other minerals might in the same manner be found, so that in said articles of association provision was made, as hereinbefore shown, for the operation of said company in petroleum and other minerals; but complainant avers that it was not contemplated that said company should operate in drilling or mining for petroleum or other minerals, or in purchasing, leasing, or otherwise acquiring petroleum wells, or the product thereof, or in furnishing petroleum for consumption or use, independently of its business as a natural gas company, but that its operations in petroleum and other minerals were intended to be such only as were connected with and incident to its business as a natural gas company, and that, in so far as it was contemplated that said company should or could engage in any kind of manufacturing business, such business should be incidental to its business as a natural gas company, and confined to the conversion of the petroleum and other products, exclusive of natural gas, obtained from its natural gas and petroleum wells, into gas for fuel and light and other articles of commerce, and did not contemplate or mean that the said company could or should at any time, be converted into an exclusively manufacturing company engaged in the business of manufacturing artificial gas from coal or other minerals, not the products of its natural gas and petroleum wells; and plaintiff avers and charges that during the entire existence of said Consumers' Gas Trust Company the operations and business of said company were at all times confined to natural gas, exclusive even of any operations or dealings in petroleum, until after the natural gas supply had become much depleted, when there was an inflow of petroleum, so that the natural gas leases and wells of the company yielded in some instances petroleum in sufficient quantity to make it worth while for the company to collect and dispose of the same by sale as crude oil in

the market, which it thereafter did and is still engaged in doing in a small way and only incidental to its business as a natural gas company."

During the period commencing, July 1, 1893, and ending July 1, 1903, the company paid interest at the rate of 8 per cent. per annum on its capital stock as represented by the final certificates, and dividends as well, and the dividends so paid aggregated 95 per cent. of the par value of each share. These payments of dividends and interest were made out of the earnings of the company in its natural gas business, and, excepting the amounts so paid, together with the operating expenses and the sum reserved for contingencies, all of the receipts of the company, as well as its entire capital stock, were expended for its plant, lands, and gas wells, and in the transportation of the gas and distribution to the inhabitants of such city, so that at the commencement of the action the assets of the company, except certain sums realized from the sale of a certain portion of its plant, consisted of the natural gas mains and pipes, pumping plants, and leases of natural gas lands which had been used exclusively for the production, supply and distribution of natural gas; and it is averred that the property was not adapted to any other use or business, and had not been constructed, acquired, or intended to be used for any other purpose or business. It is further averred that no authority exists, by ordinance or otherwise, for the use of the streets or public places of Indianapolis by the company for any other purpose than distributing and supplying natural gas. It is further averred that the supply of natural gas has failed, so that it has become impossible for the defendant company to bring to the city of Indianapolis an adequate supply for any purpose to any of its consumers, except a small number who were supplied near to the high pressure mains at the point where such mains enter the city, and who consume substantially all of the gas delivered by such mains, and that even they were not sufficiently supplied, and such supply would shortly fail; that when it became apparent that the supply was failing, and it would never be practicable to reduce the price as prescribed in an ordinance of June 27, 1887, and that it would eventually become impossible to supply the same at any cost to the inhabitants of the city, the defendant company ceased to extend its system of distributing mains and pipes in the city, and confined its operations thereafter to the territory to which its system then extended, which only accommodated about 40 per cent. of the inhabitants of the city; that after the winter of 1902–03, it became impossible to carry on the operations of the company in supplying natural gas without actual loss, and during the winter of 1903–04 such operations were impossible, even at a loss, to afford service of any value to the few consumers who were supplied near the mains entering the city; that thereupon the board of directors, in anticipation of the cessation of the business of the company, sold certain of its leases and part of its lines of mains and pipe, and the money realized therefrom was substantially all the money in the treasury of the company when the annual meeting of the stockholders was held in November, 1903, for the election of a board of directors.

In November, 1903, at the annual meeting of the stockholders, the trustees elected as the board of directors the defendants Bement Lyman, John P. Frenzel, Albert A. Barnes, John E. Scott, William J. Richards, Henry C. Atkins, James W. Lilly, Hervey Bates, Jr., and Frederick Fahnley, of whom Bement Lyman, John P. Frenzel, Albert A. Barnes, John E. Scott, and Frederick Fahnley had been members of the board during the preceding year; and the directors so elected thereupon qualified as such, and ever since had been and now are the board of directors of said company, and as such ever since have been and now are in the control and management of the business and affairs of said company, each of them being stockholders in the company, holding as their only evidence thereof certificates in the form of the final certificate hereinbefore set out. Thereupon, it is averred, this board of directors, "by a majority only of its members, to wit, said William J. Richards, Henry C. Atkins, James W. Lilly, Hervey Bates, Jr., and Albert A. Barnes, adopted as the true construction of the articles of association of said company that the holders of the certificates representing moneys paid to said company for its shares of capital stock in discharge of the subscrip-

tions for such shares, made in the form hereinbefore set out, were not stockholders in said company, nor in any way represented by the board of directors thereof, nor interested, as beneficiaries or otherwise, in said company or its business or assets, except only that they were entitled to receive a further and final payment of five per centum of the par value of the amount stated to have been paid to said company in the respective certificates held by them, together with interest from July 1, 1903, at the rate of eight per centum per annum on such five per centum until the same was paid; that upon such payment being made the entire assets of the company were subject to be managed, controlled, and disposed of by the board of directors, without accountability in any way to the holders of said certificates, or any of them, as having any interest in said company, or in its shares of capital stock, by virtue of said certificates; that it was within the objects and purposes for which said company was organized to engage in the manufacture from coal and other substances of artificial gas, for fuel and light, and to supply the same to the inhabitants of the city of Indianapolis at the bare cost of such manufacture and sale, the said company being limited by its articles of association to furnish such gas at cost, so that it should not make any profit whatever from its future business and operations; and that the board of trustees, after such final payment to said certificate holders, would continue to hold in trust the shares of the capital stock of said company during the corporate existence of said company, for the purpose of voting the same for all the purposes for which said stock could be voted, and to exercise all the other rights and powers resulting from the ownership of the shares of the capital stock of said company, as trustees for the inhabitants generally, of the city of Indianapolis, or such of them as should be or desire to be supplied by said company with artificial gas for fuel and light, in order to secure to such inhabitants the continuance of such supply at the actual cost thereof, and no more during the existence of said company." It is further averred that the board of directors by like majority constantly maintain and assert, in substance, "that the rights and powers of said company, and of its board of directors and trustees, and of the holders of certificates issued by it on account of payments for shares of its capital stock, and of the inhabitants of said city generally, or such of them as shall desire to be supplied with artificial gas, are respectively such as are above stated, and not other or different, and that it was and is their right and duty to control and manage the business of said company and to dispose of its assets in accordance therewith"; that in pursuance of such construction and policy it was resolved by the board to make a final payment "of five per centum of the amount represented by each final certificate issued by said company," together with interest thereon to January 1, 1904, and set apart the moneys to make such payment, and that payments be made accordingly by the treasurer of the company upon presentation of the certificates; that each certificate should thereupon be stamped as fully paid, and thereafter no further payments should be made to the certificate holders; and the directors have ever since maintained and asserted that by such action all right, title, and interest of each and every certificate holder is extinguished, except to receive a final payment so provided for.

The board of directors proceeded thereupon to ascertain the cost of constructing a plant for the manufacture of artificial gas and the cost of supplying the same, and the value of the natural gas plant and other assets of said company, and what part, if any, of said plant could be adapted to use and be used in manufacturing and supplying artificial gas, and the cost thereof, and also the amount that could be realized by sale of the remaining plant and assets of the company—all at the expense to the company of $3,700—and thereupon, on February 9, 1904, by like majority vote, adopted the following resolution: "Whereas, pursuant to the resolutions adopted by this board on November 7, 1903, and November 17, 1903, the board has secured reports from the auditing committee authorized to examine and report as to the financial condition of the company, and also reports from Mr. Prossor and Mr. Brill, experts employed to report as to the value of the assets of the company, and also as to the methods and probable cost of constructing a plant for the manufacture of artificial gas: Therefore be it resolved that

it is the judgment of this board of directors that it is practicable for the Consumers' Gas Trust Company to construct a plant for the manufacture of artificial gas to supply the citizens of Indianapolis with fuel and illuminating gas. And be it further resolved that, for the purpose of raising funds for the construction of such plant, we favor the sale by the company of its leases and other property outside of the said city, and the borrowing by the company of such additional funds, not exceeding the sum of $500,000, as may be found necessary for the construction of such plant. Therefore be it further resolved that the company do borrow the sum of $500,000 for the construction of such plant, such sum to be used as a special fund for the purpose, and only for the purpose, of constructing such plant, such sum to be borrowed upon such security and such terms as may be hereafter determined by the board of directors and board of trustees. And be it further resolved that the board of trustees of the company be requested to signify their consent to such proposed loan and the contracting of such indebtedness as may be incurred in the construction of such plant. It being the intention of this board in carrying out these resolutions to furnish artificial gas to the consumers of this company at ultimate cost, and we pledge ourselves to this policy."

The value of the natural gas plant of the defendant company, including leases and other assets, is averred to amount to $960,078.50, with no existing indebtedness against the company. It is also averred that the board of directors has no power to carry on the business, except as a natural gas company; that, as it is impracticable to further continue such business, it is the duty of the board to wind up the company and make distribution of its assets to the certificate holders in proportion to their shares; that the value of complainant's certificates exceeds the face value thereof, unless the business shall be converted into an artificial gas company to sell gas at cost, in which case their value would be only $175. That on February 17, 1904, he demanded of the defendants constituting the board of trustees, at a time when they were in session as a board, that they should take action to prevent the board of directors from converting the company into an artificial gas company, and from denying his rights as a shareholder, which request was refused. It is further averred, in the amendment to the bill, "that the board of directors of said company will, after selling, or otherwise disposing, as soon as they can, of the entire plant and other property of said company, except its mains and pipe lines in the city of Indianapolis, expend all of the proceeds thereof, and other moneys borrowed by them on the credit of said company, in the construction of an artificial gas plant, and engage said company exclusively in the manufacture of artificial gas as hereinbefore alleged, and in selling such gas to consumers in the city of Indianapolis at the bare cost thereof, without any profit to said company, and so to continue to do until the term of existence of said corporation has expired, in accordance with the construction put by them as aforesaid upon the articles of association of said company, and in order to carry into effect such construction."

The answers of the defendants do not controvert the allegations of fact in the bill respecting the authority and form of the corporate organization, terms of subscription and stock certificates, operations of the company, proceedings of trustees and directors, respectively, and cessation of the supply of natural gas, so that it is no longer practicable to furnish it to the people of Indianapolis. But matter is set up by way (1) of challenging jurisdiction of the bill, (2) of showing that the founders intended and created a trust in favor of the people of Indianapolis for supplying gas at actual cost, whenever the shareholders were repaid the amount of their investment and interest, and (3) of showing power vested in the trustees, through the terms of the organization, aided by subsequent legislation and the intention and conduct of the corporators, to employ the franchise and assets in the production and supply of artificial gas to that end. While the allegations of the answer are voluminous, the appellants' brief presents a concise statement of the ultimate facts and deductions—aside from legislation procured subsequently to the organization—which are relied upon for reversal of the

decree. Such abstract is adopted as sufficient recital of the matter so set up, namely:

"Natural gas was discovered in Indiana in 1886–87, 25 miles north of Indianapolis. The Consumers' Gas Trust Company was organized on November 2, 1887, under the manufacturers' and miners' act—chapter 35, Rev. St. 1881, now chapter 38, Burns' Ann. St. 1901. During the year 1887 two lines were being constructed from the gas field to the corporate limits of the city for the purpose of supplying natural gas. These lines were bought up by the Indianapolis Gas Company and those allied with it, which had the only gas plant in Indianapolis. The city council, in June, 1887, had passed an ordinance fixing schedules of prices for natural gas when used as fuel or light. After the Indianapolis Gas Company had acquired control of the lines aforesaid, it caused to be introduced into the common council an amendatory ordinance largely increasing the rates fixed by the ordinance. The people were disappointed and determined to resist the threatened monopoly. A public meeting was held on the Board of Trade on October 27, 1887, and a plan was presented and adopted for constructing a gas plant by the people and for the people. A corporation was to be organized, but not as a money-making venture. This plan was, in short, that every man should be asked to subscribe such sum as he felt able to contribute; that the corporation should be organized under the manufacturers' and miners' act, and in such way as that it could never pass under the control of the Indianapolis Gas Company, or any other person or corporation; and when the subscribers had been repaid the amount of their subscription, with 8 per cent. interest, then the company should furnish gas to the people of the city at cost. Committees were appointed to take subscriptions, to frame the articles, and so on.

"The committee on organization, in carrying out the purpose, framed the articles so as to provide that all the capital stock, when paid for, should be issued to a board of five trustees, named in the articles, who were given power to fill all vacancies on their board, and who were given full, exclusive, and irrevocable power during the continuance of the corporation to hold all the stock and vote the same as fully and completely as if they were the owners of said stock. By article 7 the trustees were required to issue to each subscriber, upon the payment in full of his subscription, a final certificate showing the amount of stock held by the trustees in trust, which amount, par value, was to be repaid by the company, with 8 per cent. interest. When a certificate holder had been repaid, by dividends or otherwise, upon his certificate, an amount equal to his subscription, with interest as aforesaid, and after the payment of all indebtedness of the company, 'then it should be the duty of said directors to reduce the price of gas, so that the same shall thereafter be supplied at cost.' The objects of the corporation were stated in article 2 as follows: 'Art. 2. The objects of the formation of such corporation are to drill and mine for natural gas, petroleum, and other minerals, and to purchase, lease, and otherwise acquire gas and petroleum wells and the products thereof, and to furnish the same to its patrons for use, and by manufacture to convert the same into gas for fuel and illuminating purposes, and other articles of commerce, and the sale of the product to its patrons, to these ends to take, hold, convey, and mortgage real estate, by fee simple or lesser title, and to own, operate, and maintain such machinery, works, lines of pipe, and appliances as the carrying out of the objects above mentioned may require.'

"The company was organized, put 133 miles of pipes in the city, connected this plant with the gas field, and supplied gas in this way till it gave out early this year. As each subscription was paid there was issued the same final certificate of payment to every person entitled to repayment. The company owes no debts, and has paid 95 per cent. of the principal of these certificates and all the interest, and in 1903 set apart a sum sufficient to pay the remaining 5 per cent. and notified the owners to come and get their money. Four of the trustees and five of the directors now favor the construction of gas works in connection with the city plant to supply gas to the people at cost. The remaining trustee and the minority directors contend that the corporation has no power to engage in the business of manufacturing gas, holding that its powers are limited to furnishing natural gas

only. In this posture of affairs, Byron C. Quinby, of Massachusetts, a certificate holder, filed his bill on February 19, 1904, in the Circuit Court, against the company and the five trustees and nine directors, to enjoin the company from using its assets or borrowing money to erect gas works, and to manufacture and supply gas, on the ground that the company has no power, under the articles and laws, to do so. The minority trustee and the minority directors, holding to this view, suffered default. The corporation and the majority trustees and directors appeared and first filed a plea, showing that the total assets of the corporation were of the value of $960,078.50, that the face value of the certificates outstanding was $788,657.10, and that the complainant held three certificates, one of the par value of $2,500, one of the par value of $265.40, and one of the par value of $743.45; that the largest certificate was issued first to John and Edward Schmidt, citizens of Indiana, and by them assigned to the complainant, who took a reissued certificate from the company to himself. The plea asserts that appellant cannot sue on the larger certificate under the acts of Congress, and that the aggregate of the other two certificates is not $2,000. Wherefore that sum is not in dispute so as to give the court jurisdiction. The plea was overruled.

"Thereupon the defendants answering filed their joint and several answer, setting forth in detail and at length the material facts above stated and many others in support thereof; also showing that before the complainant filed his bill two suits had been brought and were then pending in the courts of the state involving substantially the same question presented on the bill: and, further, that there was not $2,000 in controversy; and, again, that the complainant, as a certificate holder, is not a stockholder, but in the nature of a creditor, and that his bill as originally filed and as finally amended was not verified by the oath of complainant, within the meaning of rule 94, and did not state facts as required thereby. It was further shown that some of the minority directors and others in the year 1903 had determined to acquire all the final certificates possible, wreck the corporation, wind up and divide the assets, and for this purpose had organized the Eureka Investment Company, which had acquired a majority of the outstanding certificates, and that 'complainant did not file said bill for himself alone and in his own interest, but at the instance and request and in the interests of the said Eureka Investment Company, or those allied with it in interest, and in order to help said investment company, and those associated with it, to wreck the corporation, wind up its affairs, and distribute its assets.'"

Addison C. Harris and Daniel Waite Howe, for appellants.

Ferdinand Winter and Alexander C. Ayres, for appellee.

Before JENKINS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge, after stating the facts, delivered the opinion of the court.

The questions raised by the assignments of error are: (1) Whether the court possessed jurisdiction to entertain the suit; (2) whether prior suits pending in state courts arrest jurisdiction; and (3) whether the corporation defendant is empowered to construct works and operate for supplying the people of Indianapolis with artificial gas at cost. Specific reference to the 14 assignments is unnecessary, as all contentions are within one or the other of these inquiries.

1. Jurisdiction of the bill is challenged because it appears that one of the final certificates owned by the complainant, of the par value of $2,500, was originally issued to John and Edward Schmidt, citizens of Indiana, who assigned to the complainant, and the certificate thereupon, described in the bill, was reissued by the company

to the complainant, so that, exclusive of such interest derived through assignment, the par value of his remaining certificates aggregates less than $2,000. We are of opinion that the statutory provision in reference to suits to recover the contents of choses in action in favor of an assignee [U. S. Comp. St. 1901, § 629, p. 508], on which this objection rests, is not applicable to the case at bar. The relief sought is against the use of the corporate assets for alleged ultra vires business, affecting not alone his interest, but that of all other stockholders. Primarily the cause of action is in the corporation; but, subject to the limitations of equity rule 94, a stockholder may prosecute the suit for the benefit of all. Dodge v. Woolsey, 18 How. 331, 15 L. Ed. 401; 5 Rose's Notes U. S. Rep. 587. Ownership of stock is an essential requirement to maintain the bill on behalf of the corporate interests, but the relief sought is for the benefit of all like interests, and not for that of the individual alone. The suit is not one to recover the contents of a chose in action, in the sense of the statute referred to, and it is deemed unnecessary to discuss the question whether the complainant holds the $2,500 certificate as assignee. The further contention that the shareholders retain no beneficial interest in the corporation, beyond 5 per cent. of their certificates, which has been set apart by the directors to make the amount repaid upon the principal equal to 100 per cent., is involved in the inquiry upon the merits, and will be considered under the third question for review.

The objections urged of noncompliance with equity rule 94, and that the suit appears to be collusive, under the allegations of the answer, are without force, and within the ruling of this court in New Albany Water Works v. Louisville Banking Co., 58 C. C. A. 576, 122 Fed. 776. In reference to verification of the bill, if the original verification was defective, the defect was cured by the personal verification subsequently, under leave granted by the court. The several assignments of error in respect of jurisdiction are overruled accordingly.

2. The answers aver the pendency in state courts of two prior suits—one on behalf of the corporation defendant and the other against it—wherein "the principal questions are involved which are involved here," and it is urged thereupon that rules of comity, at least, are violated by the procedure in the federal court. The case at bar, and the prior actions so set up as well, are suits in personam. It is well settled that the right of a noncitizen to maintain such suit independently in the federal forum is not barred by the pendency of a prior suit of like import in another co-ordinate jurisdiction, and this view is conceded on behalf of the appellant. As no interference with or conflict over property in custodia legis (actual or constructive) is involved, we deem it equally clear that the complainant cannot be deprived of his constitutional privilege to have the suit not only entertained, but adjudicated in due course, in the federal forum. The case of Farmers' Loan & Trust Company v. Lake Street Elevated Railroad Co., 177 U. S. 51, 61, 20 Sup. Ct. 564, 44 L. Ed. 667, and others cited in the brief for appellants upon this point, are plainly distinguishable, as neither of these pend-

ing actions is in rem, nor of a nature to vest the custody of specific property in one or the other court. No conflict of jurisdictions appears to have arisen, and we are satisfied that no invasion has occurred and that no room appears for conflict in the present aspect of the controversy.

3. The remaining inquiry goes to the merits of the decree. It involves, not only the property interests of the corporation and its shareholders, but rights asserted on behalf of the people of Indianapolis. The relief sought by the bill and granted by the decree rests upon these propositions: (1) That the corporate franchise does not authorize diversion of the business from supplying natural gas to the production and supply of artificial gas to the people of Indianapolis at cost; (2) that the cessation of the natural gas supply in the fields tributary to Indianapolis has caused abandonment of the former business as no longer practicable, so that the corporate property is no longer available for the purposes of the incorporation; and (3) that the shareholders retain their interest therein and are entitled to relief against threatened diversion and for distribution of the assets. While the appellants concede the fact thus asserted as to the failure of natural gas supply and the necessary abandonment of that business, and the purpose of the trustees and directors to undertake use of the franchise, pipe lines, and property in the city of Indianapolis for the erection of works to produce artificial gas, to be supplied to the people at cost, both of the other propositions in support of the decree are earnestly disputed. Their contentions are two-fold—referring to the purpose and scope of the incorporation, as disclosed in the circumstances, terms of the articles and subscriptions, and subsequent legislation—and in substance these: (1) That the organizers intended and created a charitable trust, in favor of the patrons and public, to provide for supply of gas in Indianapolis at cost, whenever their amounts invested in the work were repaid, with interest, and after such repayment no beneficial interest remained in the shareholders; (2) that such trust contemplated the production and supply of artificial gas, whenever the natural gas fields were exhausted, and authority was extended to that end, by the terms and intent of the articles, within the meaning of statutory provisions, either then existing or subsequently enacted.

The fact that a trust was created by the organizers for certain purposes is unquestionable. It was distinctly provided in the articles of association to place the entire capital stock under the control of five trustees, selected from the stockholders, with irrevocable power to "vote the same [as a unit] as fully and completely as if they were the owners," elect directors, and fill vacancies, while "the business and prudential concerns" were to be managed by a board of nine directors. The trustees were to issue to the subscribers for capital stock, upon full payment, certificates thereof, which entitled the holder to certain dividends; but the articles provided that when the holder shall have received in dividends or otherwise "an amount equal to his subscription," with interest at 8 per cent. per annum, and all indebtedness of the company was paid, "it shall

be the duty of said directors of said company to reduce the price of gas, so that the same shall thereafter be supplied at cost." This provision for reducing the price of gas to cost, when the subscribers had received dividends to the amount prescribed, was carried as well into the subscription agreements and the certificates issued to the shareholders. In all other respects the purposes of the corporation are for the business undertakings stated in the articles, within the statutory authority, and it is not organized as a charitable or public corporation. The shareholders have plainly agreed by these terms that the business shall be conducted without profit to the corporation, and for the benefit of consumers, after dividends have been received to the extent of the capital stock and interest. In other words, they stipulate in such event that the operation and use of franchises and property for the purposes of the incorporation shall be carried on to furnish gas to consumers at cost, instead of profit to the shareholders. The shareholders retain their shares, nevertheless, with any beneficial interest in the corporate assets which remains when the use is terminated by expiration of the franchise or other legal cause. By the articles the trustees are vested with mere voting powers, as representatives of the body of stockholders, and the directors are their representatives alike in conducting the business in conformity with the incorporation and mutual agreements. It is true that the stockholders cannot interfere in such operation and use within the purposes so delegated, but we are of opinion that they have not parted with their title as shareholders and owners, so that no foundation exists for the application of the well-recognized cy pres doctrine, invoked on behalf of the appellants, beyond the use expressed in the terms of the agreement and within the limits of the corporation. Their interest, therefore, is sufficient to support the bill and decree, if the allegations and admissions of fact as to the contemplated future use of the corporate property show that use within the incorporation limits is no longer available and that diversion therefrom is intended by the trustees and directors.

. The final question thus presented is whether the incorporation extends to the conceded purpose of constructing and operating works to manufacture artificial gas from coal or other minerals, not the product of natural gas or petroleum wells owned or leased by the company, and supply such gas to consumers in lieu of the original supply of natural gas from its wells, now exhausted. While the answer does not in terms admit the precise allegations of the bill that the manufacture intended was from coal or other minerals, not the product of its wells, no other inference is admissible under the general statements contained in the answer and the rules applicable to the pleadings when the case is submitted thereon. The single issue then arising is whether the intended change to the manufacture of gas, as the exclusive or primary business, is an ultra vires undertaking. Its solution rests upon the legislation under which the corporation was created and the articles and acts of organization. Various facts aliunde are set up in the answer and pressed in the argument on the part of the appellants as affect-

ing the interpretation of these creative acts, namely: (1) The public want and movement of citizens which preceded the organization; (2) preliminary expressions of purpose on the part of the organizers and the exalted character and professional ability of several; and (3) the obvious benefit to the community of a supply of artificial gas at cost with the corporate power so extended. We are of opinion, however, that neither of these allegations can be considered in ascertaining the powers conferred by the incorporation, which are necessarily limited by the legislative grant of authority and the specification and acts of the organizers within such grant. No extension beyond terms so authorized and adopted can receive judicial sanction, either for the benefit of the public, a community, or individuals. For interpretation of the legislative acts which govern the incorporation, the decisions of the Indiana courts of final resort are, of course, controlling, in so far as applicable to the case presented. The organization was made (as stated in the brief for appellants) "under the manufacturers' and miners' Act, chapter 35, Rev. St. 1881," and the material provision appears as section 3851 (section 5051, Burns' Ann. St. 1901), reading:

"Whenever three or more persons may desire to form a company to carry on any kind of manufacturing, mining, mechanical, or chemical business, or to furnish motive power to carry on such business; or to supply any city or village with water; or to form union stockyards and transit companies, and operating, maintaining, and transacting the business incident to such companies, or to form grain elevator companies, and constructing, maintaining, and operating elevators, and transacting the business incident thereto; or to form companies for the purpose of buying and selling dry goods, carpets, boots and shoes, millinery goods, fancy goods, or jewelry, in connection with the manufacture of such goods, and articles into any articles for which they are suitable, and for the sale of such articles, when they are so manufactured—they shall make, sign, and acknowledge, before some officer capable to take acknowledgment of deeds, a certificate, in writing, which shall state the corporate name adopted by the company, the object of its formation, the amount of capital stock, the term of its existence (not, however, to exceed fifty years), the number of directors and their names, who shall manage the affairs of such company for the first year, and the name of the town and county in which its operations are to be carried on, and file the same in the office of the recorder of such county, which shall be placed upon the record, and a duplicate thereof in the office of the Secretary of State."

The purposes of the organization are thus stated in the articles:

"Art. 2. The objects of the formation of such corporation are to drill and mine for natural gas, petroleum, and other minerals, and to purchase, lease, and otherwise acquire gas and petroleum wells and the products thereof, and to furnish the same to its patrons for use, and by manufacture to convert the same into gas for fuel and illuminating purposes, and other articles of commerce, and the sale of the product to its patrons, to these ends to take, hold, convey, and mortgage real estate, by fee simple or lesser title, and to own, operate, and maintain such machinery, works, lines of pipe, and appliances as the carrying out of the objects above mentioned may require."

When organization was completed thereunder, the directors accepted the terms of an ordinance of the city of Indianapolis, which authorized any corporation "to pipe the streets and public places and supply natural gas to the people for both fuel and light" at fixed rates. Leases were then acquired of territory in natural gas fields

available for the purpose, wells were drilled which furnished a supply of natural gas, pipe lines to convey such gas to the city and a system of lines for its distribution therein were established, and the operations were carried on and exclusively confined to supplying such natural gas, until recently, when the gas fields became exhausted. Operations then ceased, except for incidental and occasional sales of petroleum which appeared in the wells when gas failed, and the company has disposed of certain leases in the gas fields and "part of its lines of mains and pipes." The original capital of the corporation was exhausted in the work, further means were borrowed, and the indebtedness, together with further investments in construction, were met by an increase of the capital stock, authorized to furnish "the means to complete and fully equip the plant of said company," and substantially all the capital is so invested. For resumption of business as proposed, an extensive manufacturing plant must be erected in the city to produce artificial gas; from coal or other minerals, with means obtained on the corporate credit or property, utilizing alone the pipe system within the city for distribution, and operating under such new license as may be granted by the city.

That the operations thus far in obtaining and supplying natural gas are not manufacturing businesses within the statutory meaning is unquestionable. That the undertaking "to drill and mine for natural gas" and furnish the product "to its patrons for use" was within the objects expressed in the articles is plain. If the business so declared and carried on were not otherwise within the classification of "mining," as employed in the so called "manufacturers' and miners' act" (section 5051, supra), it is clearly so established by the declaratory act of the Legislature of February 23, 1889 (section 5099, Burns' Ann. St. 1894), adopted at the instance of the organizers, which defined the term "mining," as used in the former statute, to "cover and include the sinking, drilling, boring, and operating wells for petroleum and natural gas," and made it applicable to the organization in question. Tested alone by the statement of the corporate objects contained in the articles, no purpose is indicated to manufacture artificial gas to be supplied to consumers, either as exclusive or primary business of the corporation. The contemplation "by manufacture to convert" the product of its gas and petroleum wells "into gas for fuel and illuminating purposes" is specified, but that is merely incidental to the primary "mining" object, and as such within its classification as the primary business. So that, under the established general rules for construing corporate powers, we are constrained to the view that neither the abovementioned provision nor the cognate term "works," subsequently mentioned, confers authority to erect works and manufacture artificial gas from materials not "the product of its gas and petroleum wells." With the "mining" object and powers thus expressed as primary, "the exclusion of all others not fairly incidental" is strictly implied. Central Transp. Co. v. Pullman's Car Co., 129 U. S. 24, 48, 11 Sup. Ct. 478, 35 L. Ed. 55, 11 Rose's Notes U. S. Rep.

137 F.—57

1135. Irrespective, however, of this construction of the articles under the general doctrine, the authorities in Indiana are decisive that the statute under which this organization was made limits the business to be adopted thereunder to a single class of the several classifications enumerated in the section, and that it was not competent to combine two or more of the purposes so classified in a single incorporation, as primary business. Burke v. Mead, 159 Ind. 252, 64 N. E. 880, and cases cited; Williams v. Citizens' Enterprise Co., 25 Ind. App. 351, 57 N. E. 581.

In Burke v. Mead the question arose in a suit for specific performance of a contract whereby Mead & Co. agreed to transfer certain property to Burke and another, in consideration of a transfer of certain paid-up capital stock in a corporation called the "Marion Electric Company." One of the defenses was that the alleged corporation was not a legal organization, so that the capital stock was worthless. The purposes of incorporation, as stated in the articles, were "of manufacturing, storing, selling, delivering, and distributing electricity for light, heat, and power, and for all such other chemical purposes as electricity can be applied to, and for the purpose of manufacturing and selling all kinds of electrical appliances, apparatus, and supplies." The court upheld the contention that it was not competent to combine these purposes in a single incorporation; that while the "generating of electricity is manufacturing, within our manufacturing and mining companies act," the manufacture and sale of "all kinds of electrical appliances, apparatus, and supplies is not a business incident thereto"—citing Franklin National Bank v. Whitehead, 149 Ind. 560, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. Rep. 302, and Williams v. Citizens' Enterprise Company, 25 Ind. App. 351, 57 N. E. 581. It was ruled accordingly that the articles "disclosed a purpose to engage in lines of employment and business more diverse than the statute authorized" and that the incorporation was invalid.

In Williams v. Citizens' Enterprise Company, supra, the Chief Justice delivered the unanimous opinion of the court, denying the right of the corporation to recover upon a subscription to its capital stock for like defect in the diversity of objects stated in the articles of association, under the same statute. After remarking, "It is conceded that several objects and purposes are stated in the articles for which a corporation may be organized under the manufacturing and mining act," and disposing of the contention that this was permissible under a former ruling of the court in Shick v. Enterprise Company, 15 Ind. App. 329, 44 N. E. 48, 57 Am. St. Rep. 230, the opinion states:

"To adopt appellee's view, we must change the reading of section. 5051, supra, and wherein it specifies the classes of business set out we must use the word 'and' where the Legislature used 'or.' This would lead to the result that it was the legislative intent that all the businesses enumerated in the section might be carried on by one corporation; for it must be admitted that, if more than one class may be included in one corporate organization, then all the classes may be included. The Legislature has seen proper to provide in separate acts for corporate organizations to do banking, building and loan, railroad, and some other businesses. It is clear that under

these acts a corporation could not be organized to do both banking and railroad business. They have no necessary relationship with each other. Neither one is a mere incident of the other, and the Legislature has expressly separated them. And under section 5051, supra, there is no necessary relationship betwen supplying a city or village with water and maintaining and operating elevators; nor is either one a mere incident of the other. And the same may be said of all the classes of business named in the section. It is not to be inferred, from the fact that all these classes of business are included in one act, that they may be conducted by one corporation. The Legislature, by placing banking and railroad business in separate acts, and thus providing for separate corporate formations, has no more effectually separated corporate organizations for conducting those businesses than it has the classes of business enumerated in the above section. The use of the disjunctive 'or' makes a complete enactment as to each class of business named. * * * The act expressly requires that the certificate shall state the corporate name and the 'object' of its formation. This means that the certificate shall state the particular class of business to be carried on under one of the designated heads; that the limitation of the business must be shown by a statement in the articles."

Then, referring to the purposes stated in the articles under consideration, the opinion proceeds:

"We must, then, give to the articles the construction that the corporators intended to conduct these various enterprises under one organization. There is no statute in this state authorizing a single corporate organization for the purpose of carrying on all, or any two, of these businesses. The objects of neither are incidental or secondary to the objects of either of the others, but the objects and purposes of each are primary. Each is entirely separate and distinct from the others. Either would properly be the subject of corporate organizations; but the intention of the corporators, which must be gathered solely from the articles, does not indicate which was to be the exclusive purpose. * * * It is manifest, from the reading of the statute, that it was not the legislative intent to authorize a corporate organization for all the purposes named in the statute, nor for any two or more of the purposes named."

After reviewing and citing numerous authorities, the opinion concludes:

"As there is no statute authorizing the organization of a corporation for the purposes named, it follows that the articles of association are void."

The force of these decisions is not impaired by either of the suggestions to that end in the brief for appellants: (a) The validity of the incorporation for the primary object of supplying natural gas is neither questioned nor questionable, and it is diversion only to a manufacturing business that is declared ultra vires. (b) The case of Marion Bond Co., Trustee, v. Mexican Coffee & Rubber Co., 160 Ind. 558, 65 N. E. 748, cited as inconsistent with these rulings, impresses us as neither applicable, nor in any sense modifying the construction upheld in the previous cases. (c) An act of the Legislature, approved March 3, 1903 (Acts 1903, p. 147, c. 73), amends the statute in question in various particulars, so that several objects may be included in one incorporation; and then declares that prior incorporations stating several objects are thereby "legalized and validated." The contention that this and other enactments subsequent to the incorporation authorize the change of business is untenable in either aspect of the controversy. Under the foregoing construction of the articles, irrespective of the statutory power, the

amendment of 1903 is inapplicable, as several objects are not stated. Construing the statute under which the incorporation was made as the decisions require, no undertaking to engage in manufacturing, otherwise than incidental to the primary "mining" business, can be imputed to the organizers, and their contract rights so established cannot be impaired by subsequent legislation.

We are of opinion, therefore, that no error is well assigned, and the decree of the Circuit Court should be affirmed.

GROSSCUP, Circuit Judge (dissenting). I concur in the opinion of the court to the extent that it holds that the Circuit Court had jurisdiction of the cause. I agree, also, that the stockholders of the Consumers' Company have an ultimate interest in the Company's assets—the trust to the people of Indianapolis first being exhausted—that would entitle them to bring this suit. My dissent is based solely on my view that under the articles of incorporation, and the statute of Indiana, the Company is not without corporate power to manufacture fuel and illuminating gas.

In interpreting these articles and the statute, some general facts must not be overlooked. One of these is that the life of natural gas fields is a limited life. Natural gas does not replenish itself. Another is, that gas and oil are so nearly related in origin, that when the natural gas supply fails, oil may be expected to follow. Still another is, that oil is readily converted into gas. And still another, that upon calculations based on these facts, millions of dollars have been invested in distributing systems and pipe lines, which but for oil or other gas producing mineral, available as a substitute when the natural gas supply was exhausted, would not have been invested at all. We must, I think, assume that these well known facts were in the mind of the incorporators of the Consumers' Company; and that they ought to enter into the interpretation that should be given to the Indiana statute. With this in mind, let us look at the articles of incorporation, and the Indiana statute.

The expressed object of the corporation is "to drill and mine for natural gas, petroleum, and other minerals; and to purchase, lease and otherwise acquire gas and petroleum wells, and the products thereof, and to furnish the same to its patrons for use; and by manufacture to convert the same into gas for fuel and illuminating purposes, and other articles of commerce." Whether the power to convert "the same," by manufacture, into gas for fuel and illuminating purposes was intended to go back to the first clause, thus including, as the material out of which the gas should be manufactured, both petroleum and other minerals; or was intended merely to go back to the clause immediately preceding, thus including, as the raw material, petroleum only; is a question we need not now decide. Unquestionably, the statutory power to manufacture out of either or both existing, the articles of incorporation could, in this respect, be amended; for though stockholders have a right to stand upon the contract, they have no right to defeat the paramount purpose of the incorporation, even though to carry out that purpose an amendment to the articles may be necessary.

The paramount purpose—the purpose that moved the subscribers to make an investment of a million dollars in the distributing system in the City of Indianapolis—was not to engage in mining or manufacturing as men engage in a business venture; but to furnish the people of Indianapolis with gas at cost, for fuel and illuminants. Doubtless the proximity of the natural gas fields gave to the enterprise its origin. Doubtless it was believed that for a time, at least, these fields would furnish the supply of gas needed. But the end sought was gas, not a mining or manufacturing venture; and mining or manufacturing was looked to only as a means to that end.

Will any fair reading of these articles disclose, that one means —natural gas—being exhausted, no substitute was to be accepted? Why, then, the clause "and by manufacture to convert the same into gas for fuel and illuminating purposes?" Can any reasonable construction of the articles omit that clause? Can the clause, in view of the general facts stated, be shunted off into some side or incidental meaning, such as that it referred only to the commercial products of petroleum or other minerals? I think not. I think that if this enterprise had been launched as an ordinary corporation for profit, there would be no doubt of what the promoters contemplated—a substitution of means when that became necessary; and I cannot agree to hold, considering what was plainly written into the articles, that the promoters of this public enterprise are to be considered as less far sighted than would have been the promoters of an enterprise strictly for profit.

The opinion of the majority does not expressly, at least, controvert this interpretation of the articles. That opinion turns on the point that under the statute of Indiana, a corporation could not lawfully be organized that would include both the power to mine and the power to manufacture, where neither power is strictly incidental to the other. Generally speaking, the point is perhaps well taken. But applied to this case, it ignores the salient facts of the case. The salient purpose of the incorporation, as already stated, is to furnish the people of the city with a fuel and illuminant. The sole contribution of natural gas to that purpose is that natural gas brings to the consumers' burner the carbon needful to a fuel or illuminant. But petroleum and coal contain this carbon also. The only difference between natural gas and petroleum or coal, in this respect, is, that in the case of natural gas the carbon comes to the burner in its natural state—on the back of its own horse—while in the case of coal or petroleum, the carbon must be carried by a gas evolved, by manufacture, out of the coal or petroleum. But in either case, the carbon is mined, and, in either case, it performs the same function when the burner of the consumer is reached. Now does the mere fact, that in one case the carbon reaches the burner in almost precisely the state it left the mine, while in the other it must be transferred, in transitu, to a carrier that will bring it up to the burner, make any difference in the incorporability of the enterprise as a whole? Is the mere converting process, pursuant to the ultimate end in view, a thing essentially separate from, and,

within the meaning of the Indiana decisions, not incidental to, the practical general purpose for which the corporation was organized? I cannot think so. I cannot believe that the people of Indianapolis are to be deprived of an investment, into which a million of dollars have gone, upon a technical distinction carrying so little substantial difference. The Indiana cases relied upon (Burke v. Mead, 159 Ind. 252, 64 N. E. 880; Williams v. Citizens' Enterprise Co., 25 Ind. App. 351, 57 N. E. 581) do not seem to me to maintain the position taken. Those decisions were based not on technical, but on substantial distinctions.

Take Williams Company v. Citizens' Enterprise Company, for illustration. In that case the articles of incorporation stated the purpose of the company to be "to promote and aid the growth of the City of Muncie and vicinity in Delaware County, Indiana; to locate, establish, carry on, maintain and assist all kinds of mining and manufacturing companies, and to furnish power, motive power, machinery, and buildings therefor; to buy, sell and manufacture all kinds of merchandise; to sink, operate, buy and sell gas wells; to take stock in other corporations, loan and donate money, etc."

It would be supererogation to comment on that case. In those articles it was attempted to consolidate into one corporation the business of mining, the business of manufacturing, the business of erecting buildings, the business of machinery making, the business of merchandising, the business of loaning money, and the business of a holding corporation, that is, a corporation whose function is to hold the stock of other corporations. Of course Indiana has granted no single corporation any such omnibus authority.

The other case—Burke v. Mead—was a case where a corporation organized to manufacture, store, sell, deliver and distribute electricity for light, heat and power, sought power also to manufacture and merchandise all kinds of electrical appliances, apparatus and supplies. Between the power to manufacture and merchandise electrical appliances, apparatus and supplies, and the power to install and operate an electric light, heat and power plant, there is no interdependent or functional connection. Neither power, in any just sense, is essential to the full exercise of the other. They are as separate from each other, functionally, as is the corporation that makes glass lamp chimneys from the corporation that pumps and refines lamp oil; or the corporation that manufactures steel rails, from the corporation that operates a steam railroad. True, they relate to each other, as matters of convenience—as businesses that might profitably be carried on together—but in no appropriate sense can they be said to be co-operative means to the same end.

I cannot believe that the Supreme Court of Indiana will ever employ these cases as a pre-judgment, that though gas in its natural state, and gas bound up in petroleum, or coal, are to the business of supplying carbon to the burners of the consumers, means pretty nearly the same, to an end exactly the same; and though in financing an enterprise involving an outlay of a million dollars, these means must have been calculated upon interchangeably, as substitutes for each other; a mining of these means, and the incidental conversion

by manufacture of one of them to the practical end in view, may not be undertaken by a single corporation, because it so happens, that in previous applications of a substantial and healthful distinction of the law, a banking institution was refused permission to corporately hitch up with a gas well, and the merchandising of electric bulbs was not regarded as an essential part of the operation of an electric lighting plant.

"We know of no rule or principle," says Chief Justice Bigelow in Brown v. Winnisimmet Company, 11 Allen, 326, approved by the Supreme Court of the United States; Jacksonville Company v. Hooper, 160 U. S. 525, 16 Sup. Ct. 379, 40 L. Ed. 515, "by which an act creating a particular trade or business, is to be strictly construed as prohibitory of all other dealings or transactions not coming within the exact scope of those designated. Undoubtedly, the main business of a corporation is to be confined to that class of corporations which properly appertain to the general purposes for which its charter was granted, but it may also enter into, and engage in transactions which are auxiliary or incidental to, its main business, which may become necessary, expedient, or possible, in the care and management of the property which it is authorized to hold under the act by which it is created."

To the extent of the doctrine thus laid down, we need not go. We need apply only what appears to me to be the most obvious principles of interpretation. The laws of Indiana provide that whenever three or more persons may desire to form a company to carry on any kind of manufacturing, mining, mechanical or chemical business, they may, upon following the formula therein prescribed, become a corporation. Under that authority the Consumers' Gas Company was incorporated. Its business purpose, as already stated, was to furnish the people of Indianapolis with gas—its corporate purpose, as a means to that end, to mine natural gas, petroleum, and other minerals, and by manufacture to convert them (at least petroleum) into gas. To attain the end in view, the power to manufacture was just as essential as the power to mine. The manufacture was indeed only a treatment or modification of the product mined—a treatment and modification essential to the purpose for which the product was mined. Without the co-operation of both of these powers—the mining, and the modification, by manufacture, of one of the products mined—the whole investment would have been precarious. Could there be a case stronger for the unification, in one corporation, of these related powers? Has Indiana said that no corporation that mines, shall, even incidentally to the purpose for which it is organized, manufacture also? A prohibition so broad as that is not claimed; that mining and manufacturing may, in related instances go together, in one corporation, is conceded; and any such concession must necessarily include, in my judgment, the case now before us. Not to include it would, I cannot help thinking, be to apply to this corporation, organized to subserve a public trust, less latitude of interpretation than would be given to cases involving in the ordinary way purely vested interests.

My judgment is, that the decree of the lower court, enjoining any manufacture of gas, and winding up the corporation, ought to be reversed, with instructions that the Circuit Court give to appellant, the Consumers' Gas Company, reasonable time in which to elect what it will do, that the company can lawfully do, in accordance with the views herein expressed.

The decree is affirmed.